364

Joseph D. Ryan, Appellee, v. The Pennsylvania Railroad Company, Appellant.

Gen. No. 35,905.

Heard in the second division of this court for the first district at the April term, 1932. Opinion filed November 22, 1932.

Loesch, Scofield, Loesch & Burke, for appellant.

Edmund M. Sinnott and Joseph D. Ryan (*pro se*), for appellee.

Mr. Justice Scanlan delivered the opinion of the court.

This suit was brought to enforce a lien under the Attorney's Lien Law, Cahill's St. ch. 13, ¶ 13. From a finding and judgment in favor of petitioner in the sum of $2,200 respondent has appealed.

The petition alleges, *inter alia,* that petitioner, Joseph D. Ryan, is a legally licensed attorney and that on March 2, 1931, one A. G. Meadows entered into a contract with petitioner whereby he retained petitioner to represent him in the prosecution of a claim against respondent for personal injuries sustained by him through the alleged negligence of respondent; that the contract provided that in consideration of legal services rendered and to be rendered him he agreed to pay petitioner 20 per cent of any amount received or realized from his claim, and further provided that he assign to petitioner 20 per cent of any judgment thereafter recovered and of any sum thereafter paid or agreed to be paid in settlement of the case; that the statutory notice of petitioner's lien was served upon respondent; that petitioner then instituted a suit at law against respondent on behalf of Meadows and the cause was placed on the court calendar in September, 1931, and assigned for trial; that on October 27, 1931, respondent served a notice on petitioner that on October 28, 1931, it would appear before one of the judges of the court and file a stipulation in the cause, executed by the parties thereto, without the consent of the plaintiff's attorney, to dismiss the suit; that the notice stated that the suit had been settled and the settlement paid, and that respondent would move the court for an order dismissing the suit; that pursuant to said stipu-

lation, upon motion of respondent, the suit was ordered dismissed; that petitioner had no notice or knowledge of the settlement, and that the same was secretly and collusively made between Meadows and respondent long after the notice of petitioner's claim for lien had been served upon respondent; that respondent failed and refused to pay or satisfy petitioner's lien or any part thereof, and that Meadows failed and refused to pay petitioner the moneys due him under the terms of the contract or any part thereof. The answer of the respondent avers, upon information and belief, that the Meadows-Ryan contract was not enforceable, inasmuch as it was entered into through the solicitation of petitioner by persons employed by or connected with the Brotherhood of Railway Trainmen, one of whom was also an employee of petitioner in the solicitation of claims against railroad companies and who was receiving from petitioner for services in that behalf $125 a month; further avers, upon information and belief, that petitioner did not at any time investigate the facts surrounding the accident in question, but that an investigation was made by persons employed by or connected with the Brotherhood and that petitioner paid some of said persons money, and that the facts attending the accident were reported to petitioner by said persons; further avers, upon information and belief, that "the employee" of the Brotherhood was also an employee of petitioner and that said employee together with other employees of the Brotherhood solicited Meadows to employ petitioner to prosecute the action against respondent, and induced Meadows to employ petitioner to prosecute his claim against respondent; further avers that the manner in which the claim was solicited and petitioner employed is contrary to the ethics of the legal profession and the public policy of this State, and that therefore "attorney's fees cannot be recovered"; further avers, upon information and

belief, that the agreement between petitioner and Meadows did not truthfully set out the compensation which petitioner was to receive; that under an agreement between petitioner and the Brotherhood the latter was to receive 6 per cent of whatever sum was received by Meadows as a result of the claim or suit and petitioner was to receive for his services only 14 per cent of the sum received by Meadows; that the Brotherhood was not engaged in the practice of law and that because of the said agreement petitioner solicited the claim, and "through the various agencies aforesaid the said Meadows was induced to enter into said contract."

Petitioner was the sole witness in his behalf. Respondent called only two witnesses, Tom J. McGrath, general counsel for the Brotherhood, and Stephen C. Lush, an investigator for that organization. At the conclusion of the testimony of the last named witness, counsel for respondent stated to the court that the witnesses had stated the facts "just as they were" and that it would therefore be unnecessary for him to call any other witness. It was stipulated that after respondent had received notice of petitioner's lien it made a settlement with Meadows, about a week prior to October 27, 1931; that respondent paid to Meadows $11,000 in full settlement of his claim, and that the settlement was made without the knowledge or consent of petitioner.

Petitioner had practiced law in Chicago for 26 years. From our records we know that for many years he represented important corporations in the defense of personal injury cases and that for the last few years he has represented the opposite side of such cases. The Brotherhood of Railway Trainmen is a labor organization composed of conductors, switchmen, brakemen, baggagemen and switch tenders employed on steam railroads. It has 125,000 members, all of whom are

engaged in hazardous occupations. In 1930 it "paid approximately 500 insurance claims based upon total or permanent injuries and death arising in the course of employment" of certain of its members. In addition, there were "six to eight hundred cases in which men were so seriously injured in railroad service that they were not able to follow their occupation, but not considered totally and permanently disabled so as to be qualified for insurance." The idea of organizing a legal aid department was under consideration by the Brotherhood for many years. It was first proposed in 1906, but no plan was adopted until 1928, when the general counsel for the Brotherhood, because of numerous complaints made to the organization that claim agents of the railroads were making inequitable settlements with employees who were members of the Brotherhood, that exorbitant fees were being charged by members' lawyers, and that cases were frequently placed in the hands of incompetent lawyers and as a result members did not recover in meritorious cases, made an extended investigation of the subject matter of the complaints and "found an intolerable situation . . . the men were getting absolutely no legal advice and were relying entirely upon the railroads furnishing them with information as to their rights, with the result that settlements were being made which were in my judgment unconscionable." As a result of the investigation the general counsel made a report to the organization of the conditions he found, together with a recommendation that the Brotherhood create a central department to which the members could write and obtain information concerning their claims. In January or February, 1930, a questionnaire and ballot were sent to all the lodges of the Brotherhood to enable members to vote on the question as to whether a legal aid department should be organized by the Brotherhood, and by a vote of 11 to 1 the members

voted in favor of such a department. The legal aid department of the Brotherhood was then created. Thereafter the general counsel selected regional counsel and investigators throughout the United States, and petitioner was designated to act as regional counsel for the Brotherhood in the Chicago territory. The regional counsel, sixteen in number, were selected from lawyers of character, standing and ability who specialized in personal injury cases, and they were required to subscribe to certain rules and regulations relating to regional counsel that had been established by the Brotherhood. The legal aid department, upon the request of a claimant, or of a dependent in a death case, or a responsible lodge officer writing on behalf of an injured member or his dependents, made an investigation of the facts in cases where members suffered serious accidental injuries, and also provided the member who was injured, or his dependents in a death case, with an opportunity to have legal advice and counsel in the matter of the claim. On November 26, 1930, A. G. Meadows, a member of the Brotherhood, residing in Indianapolis, Indiana, while in the course of his employment by the respondent, sustained accidental injuries which resulted in the loss of an arm above the elbow. He requested the legal aid department of the Brotherhood to investigate his case, and Lush, the investigator, was directed to make the investigation. Lush made an investigation and reported the facts of the case to the general counsel of the Brotherhood. Lush met Meadows on January 9, 1931, at the home of the latter and in the course of a conversation explained to Meadows that the Brotherhood had regional counsel in different parts of the country and that he was privileged to call on any of such counsel for advice free of charge. Meadows then stated that he would be in Chicago shortly and would see petitioner, whereupon Lush stated that he was

going to Chicago and would see petitioner on the following day and would talk over the facts of the case with him so that when Meadows called upon petitioner the latter "would be in a position to talk with him intelligently about the case." Thereafter Meadows called at the office of petitioner in Chicago and discussed the facts of his case with him and asked his opinion as to the liability of the respondent and the costs of a suit, and also inquired as to the fee which petitioner would charge for the prosecution of the claim. Meadows informed petitioner that he had been offered the sum of $6,000 in settlement of his claim, by a claim agent of respondent, and that he intended to take the matter up again with that agent, and if the offer was not raised he would notify petitioner to commence suit. On February 26, 1931, Meadows wrote the following letter to petitioner:

"Mr. Jos. D. Ryan,

"Dear Sir:

"On my return I called on the claim agent, and he informed me that the six thousand was about as good as P. R. R. felt they could pay, and I guess I will have to take such action as may be necessary to force them to pay me a reasonable amount, and I think the quicker we get the ball to rolling the quicker it will be over with.

"Yours truly,
"A. G. Meadows."

Upon the receipt of this letter petitioner mailed to Meadows a form of written contract, which the latter executed and returned to petitioner. Under this contract Meadows retained and employed petitioner to prosecute all suits and claims for damages against respondent on account of the personal injuries he had sustained and agreed to pay him a sum equal to 20 per cent of the amount realized from the claim. The evidence shows that the usual and customary charge in

similar cases is 33⅓ per cent of the amount recovered, but by the agreement between the Brotherhood and its regional counsel, members of the Brotherhood were entitled to the services of any regional counsel for a sum equal to 20 per cent of any amount recovered.

Respondent contends that "the appellee is not entitled to an attorney's lien because the contract on which his claim is based was secured by unlawful and unethical solicitation and fee-splitting," that "the proof showed that there was a well organized plan or scheme by which appellee Attorney Joseph D. Ryan obtained many personal injury cases through the solicitation of the Brotherhood of Railroad Trainmen and its investigators," and that "it is clear that appellee Ryan obtained the Meadows case through the unlawful and unethical solicitation by the Brotherhood of Railroad Trainmen and its investigators"; that it "can see no difference from the standpoint of legality and ethics between an individual ambulance chaser soliciting personal injury claims, and a corporation and its investigators investigating the cases of proposed claimants and influencing said claimants to retain their Regional Counsel." After a careful consideration of all the facts we are satisfied that these contentions and arguments are without merit, and we feel impelled to say that the assertion that the Brotherhood, through its legal aid department, is akin to an ambulance chaser and that the petitioner was a beneficiary of an unethical and unlawful system of obtaining clients, is unworthy of the able lawyers who made it. The Brotherhood is a labor organization, composed of men engaged in hazardous occupations and who are banded together for mutual protection and advancement. The evidence establishes that it organized the legal aid department for the sole purpose of protecting its injured members or their families in the matter of claims growing out of injuries

sustained in the course of employment. The argument that the legal aid department was a solicitation scheme by which petitioner "obtained many personal injury cases" is a most unfair one and entirely unwarranted under the evidence. The evidence, *introduced by respondent,* shows clearly the worthy purpose of the department and the necessity for its organization and maintenance. The instant case is an illustration of its benefit to the members. Respondent, prior to the time that petitioner assumed charge of the case, twice refused to pay Meadows a greater sum than $6,000 in settlement of his claim, but when confronted with a trial, in which petitioner, an able and experienced lawyer, would appear as counsel for Meadows, it secretly settled with the latter for $11,000. That the Brotherhood did not intend to make a profit out of the operation of the department clearly appears from the testimony of the general counsel, who stated that it was not anticipated that the department would be self-supporting, and therefore provisions were made that any deficit arising out of the operation of the department should be made up from the Brotherhood's protective fund, and that at the time of the trial there was a deficit in the sum of $32,000.

Petitioner advanced the costs of starting the suit and respondent contends that while petitioner testified that Meadows was to repay him the costs advanced "it is very significant that there was no written agreement which provided that Meadows was to reimburse Ryan for the money Ryan advanced to pay the costs of the suit," and argues that this fact is a circumstance tending to support its claim that petitioner was guilty of unethical conduct. Petitioner testified that he and Meadows agreed that petitioner should advance the court costs and that Meadows would repay the same at his convenience. Such an arrangement was not unethical. (See *Wallace v. C., M. & St. P. Ry. Co.,* 112 Ia. 565, 568; *Northwestern S. S. Co. v.*

*Cochran,* 191 Fed. 146, 152; *Christie v. Sawyer,* 44 N. H. 298, 303; *Molthrop v. New York, C. & St. L. R. Co.,* 245 Ill. App. 8, 16.)

Petitioner admitted that he made several loans to Meadows, aggregating in all $550, and that he was unable to remember positively whether he took notes or receipts for the amount "without looking it up," and respondent argues that as petitioner produced neither notes nor receipts at the time of the trial "it would seem a proper inference, we submit, from this state of facts, that the money Ryan gave to Meadows was not a loan but was given to Meadows to influence him not to make a settlement with the appellant," and it contends that such conduct would be unethical and unlawful. Petitioner testified that some time after he assumed charge of the Meadows case he learned through the general counsel of the Brotherhood that Meadows was "very sorely in need," and that the Brotherhood had no funds to cover any such situation, and that later a representative of the Brotherhood asked him if he would not help Meadows; that he at first declined to do so, and later it was explained to him that if they did not help support Meadows and his family Meadows would be forced to settle his case, and that the moneys he advanced to Meadows for the support of the latter and his family were loans, and so understood by Meadows. A letter of Meadows to petitioner dated September 28, 1931, shows plainly that the advances were loans. Moreover, the evidence is undisputed that when Meadows made his settlement with respondent he mailed a check to petitioner for $550 in payment of the loans, and that upon the receipt of this check petitioner mailed back to Meadows the notes or receipts the latter had signed at the time the several loans were made. That petitioner, from a business standpoint, acted unwisely in making the loans may be conceded, but we do not think that his conduct in that regard was unethical or against public

policy, especially as he made the loans, not for self-benefit, but solely because of sympathy for the unfortunate client, whose condition might force him to settle his claim for an inadequate amount through "dire necessity." It is a not altogether unreasonable inference from the evidence that "dire necessity" finally forced Meadows to the secret settlement. Respondent admits the probability of a verdict for a larger amount had the case gone to trial. In *Johnson v. Great Northern Ry. Co.,* 128 Minn. 365, 369, the court said: "The practice of advancing money to the injured client with which to pay living expenses or hospital bills during the pendency of the case and while he is unable to earn anything, may in a sense tend to foment litigation by preventing a settlement from necessity, but we are aware of no authority holding that it is against public policy, or of any sound reason why it should be so considered." What lawyer who has practiced for many years, no matter how exact or conscientious he may have been, could truthfully state that he had never aided a needy client? Where an attorney has furnished assistance to a needy client and a charge of unethical conduct becomes a material issue in the case, the pertinent inquiry is, Was the assistance rendered with the intent of subserving the ends of justice alone? There is not a word of evidence to support the argument that petitioner loaned the moneys to prevent a just settlement of the case, in fact, the proof is that he was willing at all times "to negotiate for an amicable settlement."

Respondent further contends that petitioner paid, at the request of General Counsel McGrath, half of the salary of George Riley, a Brotherhood inspector, amounting to $125 per month, and that this is a circumstance that tends to support its charge of unethical and unlawful conduct on the part of petitioner. The general counsel testified that the law firm of Davis,

Michel, Yaeger & McKinley, of Minneapolis, was regional counsel for certain roads running between that place and Chicago, and that he, as general counsel, insisted that that firm should maintain a branch office in Chicago and keep a representative there so that members of the Brotherhood located in Chicago and its vicinity would not be required to go to Minneapolis for advice; that thereafter that law firm placed Riley in charge of its Chicago office but later found its maintenance too expensive and sought to withdraw Riley, and that he, the general counsel, would not permit this to be done if that law firm were to retain jurisdiction over the railroads in question; that he finally suggested to the Minneapolis lawyers that if they would permit the Brotherhood to use Riley for part-time work he would make arrangements with the petitioner to advance half of Riley's salary, and that such an arrangement was made, and from November, 1930, until July or August, 1931, petitioner advanced one-half of Riley's salary. Mr. McGrath further testified that his arrangement with petitioner was that the sums so advanced by the latter were to be on behalf of the Brotherhood and that it was distinctly understood that the Brotherhood was to reimburse petitioner for any moneys so advanced, and that when Riley quit the employ of the Brotherhood in July or August, 1931, the Brotherhood paid petitioner in full for the moneys he had advanced on account of Riley's salary by a check for $665.85. It will be noted that this payment was made to petitioner some time before the respondent settled the Meadows claim. Under the facts we are unable to find any merit in the instant contention.

The final contention of respondent is that the arrangement between the Brotherhood and petitioner, its regional counsel, whereby petitioner agreed to remit 6 per cent of the amount recovered towards the costs of investigation, was a "fee-splitting device"

and contrary to the public policy of the State. As we have heretofore stated, the legal aid department maintained certain investigators, and when an injured employee wrote to the department and made inquiry relative to his rights the department would answer his communication and send one of its investigators to investigate his case. It was the duty of this investigator to ascertain the facts and circumstances surrounding the accident and to make a report to the department. In addition, it was his duty to inform the injured employee that he had the right to go to the regional counsel in that district and obtain legal advice without cost but that if he preferred a regional counsel in any other district he was privileged to go to that counsel. It was further explained to the employee that if he could not effect an amicable settlement with the railroad he had the privilege of obtaining the services of a regional counsel "on a 20 per cent contract basis." In case of a law suit, the information secured in the investigation was sent to the regional counsel who had charge of the claim. Petitioner, as well as the general counsel, testified that it was agreed between the former and the Brotherhood that 6 per cent of the contract price would go to the Brotherhood to help cover the costs of investigating the case. Petitioner also testified that "it was understood that the money automatically went to the bureau. . . . If an employee, a member of the Brotherhood, received advice from regional counsel here he knows that twenty per cent of any sum he is paid does not go to the lawyer in its entirety, but six per cent of it goes to the bureau and knows that the lawyer is simply a custodian of that portion of the sum." Petitioner argues that in a case like the instant one it is absolutely necessary that an investigation of the facts and circumstances surrounding the accident be made by someone, and that if petitioner were

to employ his own investigators he would have to pay them, that in Brotherhood cases it is advisable that the investigators be members of that organization, and that in the instant proceeding it makes no difference, as a matter of ethics or morals, whether petitioner paid for the services directly to investigators or to the legal aid department of the Brotherhood; that in considering the nature of the arrangement by which the petitioner agreed to remit a portion of the 20 per cent the purpose and scope of that department should be borne in mind; that the evidence shows that it was not formed for the purpose of making a profit out of its operation nor for the benefit of regional counsel, but solely to protect the rights of injured members or their families. The burden of proving the charge made in the answer was upon the respondent, and after considering the material question involved in this appeal in the light of all the facts and circumstances, we have reached the conclusion that we would not be justified in holding that the contract on which the claim is based "was secured by unlawful and unethical solicitation and fee-splitting." Intemperate and unwarranted argument cannot obscure a record which clearly shows that the purpose of the Brotherhood is a worthy one, planned to prevent possible frauds upon its injured members and to aid them in the assertion of their legal rights, and that as a result of that purpose or plan Meadows, in the instant case, obtained the legal services of a very able and experienced lawyer and at a stipulated fee far below that usually fixed in similar cases. The settlement for $11,000, almost double the amount offered Meadows prior to the commencement of the action, tends strongly to prove the worth of the plan to the members of the Brotherhood. Respondent cites *Puls v. Chicago & Northwestern R. R. Co.*, 233 Ill. App. 625, and *People v. Berezniak*, 292 Ill. 305, in support of its position, but neither of these

cases has any application, upon the facts, to the instant proceeding. The same may be said as to several decisions of sister states that are also cited.

Respondent contends that "the appellee, if entitled to an attorney's lien, is limited to 14 per cent of $11,000, the sum paid by appellant . . . in settlement of the Meadow's claim, because appellee agreed to give to the Brotherhood of Railroad Trainmen 6 per cent of whatever amount might be realized out of said claim." There is no merit in this contention, if we are correct in our holding that the contract between petitioner and Meadows is not against public policy, as it is a matter of no concern to the respondent what petitioner may do with the amount of the fee fixed by the contract. Meadows, the undisputed evidence shows, understood the arrangement and agreed to it, and certainly respondent can ask no more than to stand in the shoes of Meadows.

The judgment of the superior court of Cook county should be and it is affirmed.

*Affirmed.*

KERNER, P. J., and GRIDLEY, J., concur.