[S. F. No. 18050. In Bank. Dec. 20, 1950.]

CLIFTON HILDEBRAND et al., Petitioners, v. THE STATE BAR OF CALIFORNIA, Respondent.

Clifton Hildebrand, in pro. per., and Sheridan Downey, Jr., for Petitioners.

Eugene D. Williams and Jerold E. Weil for Respondent.

THE COURT. — Petitioners are attorneys, Hildebrand having been admitted to practice in 1925, Bills in 1923, and McLeod in 1935. By this proceeding they seek a review of the recommendation of the Board of Governors of The State Bar that they be disciplined for the violation of rule 2, section a (commonly known as the "solicitation" rule) and rule 3 (generally referred to as the "ambulance chasing" rule) of the Rules of Professional Conduct of The State Bar of California. (26 Cal.2d 32.) The disciplinary action arose out of petitioners' representation of injured railroad men on claims against railroad companies, pursuant to a contract with the Brotherhood of Railroad Trainmen designating them as regional counsel for the Brotherhood—Hildebrand having acted alone in such capacity beginning in 1933, then joined by Bills sometime prior to 1940, and by McLeod in 1942.

By the notice to show cause petitioners were charged with 41 separate acts of solicitation of professional employment; a general "conspiracy" for the purpose of soliciting and obtaining employment as attorneys, including the employment of others to procure such employment for them, with "runners and cappers" acting for them in violation of section

182 of the Penal Code, and "dividing . . . attorneys' fees with persons not attorneys," and "knowingly accepting . . . professional employment" offered to them as an incident of the activities of such persons; and specific instances of compensation of certain named persons not licensed to practice law for their solicitation of employment on behalf of petitioners.

Petitioners filed a written answer in denial of all the charges, and in addition urged as affirmative defenses: (1) that the proceeding was "brought to serve private purposes and private spites" of the railroad companies (*Peck* v. *State Bar*, 217 Cal. 47 [17 P.2d 112]; *Burke* v. *State Bar*, 218 Cal. 143 [21 P.2d 577]; *Herrscher* v. *State Bar*, 4 Cal.2d 399 [49 P.2d 832]); and (2) that petitioners' methods of practice and activities had been approved by decisions from this and other jurisdictions. (*Hildebrand* v. *State Bar*, 18 Cal.2d 816 [117 P.2d 860]; *Ryan* v. *Pennsylvania R. Co.*, 268 Ill.App. 364; *In re Seidman*, 228 App.Div. 515 [240 N.Y.S. 592].)

Numerous hearings were held before the local administrative committee running from May through August, 1948, during the course of which an amendment was made to the notice to show cause whereby (1) the "conspiracy" count was expanded to include specific reference to petitioners' acceptance of "professional employment" as "incident to the activities . . . of the Brotherhood of Railroad Trainmen, an association that for compensation, controlled, directed and influenced such employment"; and (2) a new count was added describing the legal aid services rendered by the Brotherhood to its injured members and petitioners' connection therewith. Following petitioners' denial of these later added charges at the subsequent hearings, and argument and submission of the matter, the committee on December 1, 1948, made findings and conclusions adverse to petitioners. In this regard it will suffice to say that the committee sustained the charges of petitioners' solicitation of professional employment in more than 20 separate cases; petitioners' compensation of some six persons acting as "runners" or "cappers," and as their agents, in obtaining employment for them; and petitioners' knowing acceptance of employment through the legal aid services of the Brotherhood of Railroad Trainmen in directing the handling of injury claims by its members against the railroads. Upon such findings the committee recommended suspension from practice of the law for varying.

periods against petitioners—Hildebrand for four years, Bills for two years, and McLeod for one year.

Thereafter the record was submitted to the Board of Governors, which body, after full argument and consideration of the matter, made its own findings affirming substantially the conspiracy and solicitation findings of the committee both as to petitioners' procurement of professional employment through the activities of individuals operating as "runners" or "cappers" for petitioners, as well as through the contractual undertaking with the Brotherhood of Railroad Trainmen. However, in passing upon the separate charges of solicitation, the Board of Governors stated that such instances of alleged misconduct "dissociated from [the] basic arrangement" with the Brotherhood and "standing alone" would fail "to make out a case of solicitation" in that "in practically every such case, standing alone, there was either a proper reference or a proper contact made by the attorneys within the holdings of cases such as *Hildebrand* v. *State Bar,* 18 Cal. 2d 816 [117 P.2d 860]," and it "is only when these individual cases are viewed in the light of their relationship to the central arrangement and in the light of the evidence bearing upon the charges of conspiracy . . . that they acquire significance." With such limitation of the controlling factor in this disciplinary proceeding against petitioners, and after a detailed recital of the prevailing contractual arrangement between petitioners and the Brotherhood of Railroad Trainmen whereby the latter "channeled" the injury cases of its members to petitioners for prosecution, the Board of Governors concluded that petitioners were "guilty . . . of violations of Rule 2, section a, and Rule 3 of the Rules of Professional Conduct" but reduced the degree of discipline to be imposed upon petitioners according to the following recommendation —that "Hildebrand be suspended from the practice of the law . . . for a period of four months" and that "Bills and . . . McLeod be publicly reproved by the Court."

It appears from a full examination of the record herein that the Board of Governors properly narrowed the fundamental issue of professional misconduct to petitioners' participation in the basic plan of the Brotherhood of Railroad Trainmen in providing legal services for its members. Accordingly, the basic plan must be carefully analyzed with respect to its operation and effect in relation to the particular Rules of Professional Conduct here involved.

Rule 2, section a, reads: "A member of The State Bar shall not solicit professional employment by advertisement or otherwise." (26 Cal.2d 32.) Rule 3, so far as here pertinent, provides: "A member of The State Bar shall not employ another to solicit or obtain, or remunerate another for soliciting or obtaining, professional employment for him; nor, except with a person licensed to practice law, shall he directly or indirectly share compensation arising out of or incidental to professional employment; nor . . . knowingly accept professional employment offered to him as a result of or as an incident to the activities of any person not so licensed or of any association or corporation that for compensation controls, directs or influences such employment . . ." (26 Cal.2d. 34.)

There is no conflict in the evidence concerning the basic plan. It appears that in 1930 the Brotherhood of Railroad Trainmen established a Legal Aid Department as a service to its members and their families in procuring lawyers experienced in personal injury law to prosecute damage claims against the railroad companies, at charges which would be somewhat less than the usual percentage of contingent fees in such cases. Regional counsel was designated in each territorial zone, and the employment of such counsel was urged or strongly recommended to the injured members and their families. As part of this Legal Aid Department, there was also established an investigation service with investigators assigned to report on the facts of an accident case and obtain evidence thereon pertinent to the presentation of the damage claims.

The plan originally called for a written contract on a 20 per cent contingent fee basis, with the agreement on the part of the attorney to turn over one-fourth of that amount, or 5 per cent, to the Brotherhood for maintenance of the Legal Aid Department. Contracts were to be executed directly between the designated regional counsel and the injured claimants on forms approved by the Legal Aid Department, and such counsel was required to advance all necessary court costs, expert witness fees, expense of medical examinations, and like expenditure items. These expenses were to be deducted from the amount of recovery before a division would be made of the net sum between the lawyers and the claimants. As here pertinent in the time period involved, Hildebrand, who had been acting alone as regional counsel in this state for the Brotherhood since 1933, was joined in the enterprise by Bills sometime prior to 1940 and by McLeod in 1942; and

together they undertook by contractual arrangement with the Brotherhood to render legal services to its members in pursuance of the basic plan. Meanwhile it appears that a change was made in the contingent fee provisions so that the claimant was required to sign two contracts covering an aggregate contingent fee of 25 per cent—one contract calling for 19 per cent to the attorney for legal services and the other for 6 per cent to the Brotherhood for the maintenance of the Legal Aid Department, with its investigating service. Then as of June 15, 1946, this fee procedure was superseded under an arrangement with the Brotherhood permitting the attorneys to handle the cases on a flat 25 per cent basis but requiring them to pay the investigators, members of the Brotherhood's staff, on a *quantum meruit* basis for their services.

A realistic appraisal of this basic plan compels the conclusion that it offended recognized standards of professional conduct in providing the means whereby solicitation of the employment of petitioners was effected on a wholesale basis in violation of rule 2, section a. While the members of the Brotherhood were not compelled to employ regional counsel for the handling of their lawsuits, they were subject to continuous and strong recommendation from the Brotherhood to do so through its journal publications and circulars to the members, as well as by personal visits from officers of the Brotherhood locals advising the injured railroad men and their families to avail themselves of the benefits furnished by the Legal Aid Department, embracing selected investigating and legal services. The compensation to be received by regional counsel for their representation of injured railroad men or their families was all predetermined according to the basic plan with the Brotherhood, and the client's signing of the contracts calling for legal and investigating services on the 19 per cent and 6 per cent contingent fee basis was no more than a ratification of the Brotherhood's arrangement with the designated regional counsel. There is no question from the record but that petitioners knew exactly how their professional employment by injured railroad men was being solicited for them through the Brotherhood's activities, and they were willing to perform the desired legal services at a substantially reduced contingent fee rate in the belief that the volume of business to be directed to them through such solicitation would warrant such financial consideration.

From such aspect it is apparent that the solicitation in question had its "origin in the mind[s] of" petitioners pursuant to the common course of action arranged with the Brotherhood (see *People* v. *Levy*, 8 Cal.App.2d Supp. 763, 769 [50 P.2d 509]), and as parties to such agreement, petitioners should be held accountable for the results of their participation in the preconceived general scheme.

Rule 3 of the Rules of Professional Conduct, *supra*, expressly proscribes the remuneration by an attorney of another for "soliciting or obtaining professional employment for him," and likewise denounces an attorney's knowing acceptance of employment as a result of the "activities of . . . any association or corporation that for compensation controls, directs or influences such employment." It is clear from the record that the Brotherhood has been remunerated and compensated for soliciting, directing and influencing the employment of petitioners by its members. In the first place for its participation in the common course of action, it appears that the Brotherhood under the two-contract contingent fee arrangement—the 6 per cent allowance for investigation and the 19 per cent allowance for legal services, which was the procedure followed for a great deal of the time here pertinent—discharged a sizable deficit ($100,000) which had accrued over the years in the beginning of the Legal Aid Department's operations when the investigating services were furnished free to the members, and, in addition, built up a reserve of "approximately $80,000.00." But furthermore, it cannot be said that the reference to remuneration and compensation in rule 3 envisages only the receipt of money as distinguished from other advantages or benefits that may accrue from an employment undertaking as is here involved. Thus (1) it was a matter of concern to the Brotherhood that the lawsuits of its injured members be handled by experienced lawyers, and the basic plan with petitioners was designed to provide legal services for its members at what might be termed "wholesale rates"; and (2) such service would reasonably constitute an inducing cause for attracting membership in the Brotherhood and the payment of dues thereto. In the light of these considerations, it appears indisputable that the ethical standards envisaged by rule 3, *supra*, have been violated by petitioners.

Petitioners argue that the Brotherhood's Legal Aid plan has been approved by judicial decision, citing *Ryan* v. *Pennsylvania R. Co.* (Ill. 1932), 268 Ill.App. 364. In that

case a regional attorney for the Brotherhood sought to assert a lien for professional service, based upon a contingent fee contract of 20 per cent executed with the injured railroad man, where the railroad company had secretly settled with the client. The railroad company contended that such retainer embodied an illegal contract (1) not only in that the professional employment had been solicited by the Brotherhood (2) but also in the fee-splitting feature inherent in the arrangement in that the compensation for the attorney was in reality only 14 per cent and the remaining 6 per cent was to go to the Brotherhood as its share of the damage recovery. The contract in question was upheld by the appellate court of Illinois for the purpose of the attorney's lien, and accordingly the attorney was awarded 20 per cent of the amount of the settlement. It is true that in reaching such decision, the court fully detailed the "organized plan" in its operative effect upon regional counsel's undertaking personal injury cases for members of the Brotherhood, but such examination of the coordinated activity of the Brotherhood and regional counsel was correlated with the processes of the Legal Aid Department as a service feature to the Brotherhood's members in securing legal services at a minimum fee coincident with the competent investigation of reported injury claims. In so discussing the facts from the standpoint of the benefits afforded the Brotherhood and its members in the assertion of their legal rights rather than from the standpoint of the proprieties of the lawyer in maintaining professional standards, the Illinois court concluded that it "would not be justified in holding that the contract on which the [attorney's] claim is based 'was secured by unlawful and unethical solicitation and fee-splitting.'" (P. 379.)

The distinct premise of the Ryan decision is precisely noted in the case of *In re O'Neill* (Dist. Ct., E.D. N. Y., 1933), 5 F. Supp. 465, a disciplinary proceeding for the alleged infraction of the ethical standards of the New York State Bar Association relative to "stirring up litigation." There in passing upon the Brotherhood's basic arrangement with regional counsel for the handling of injury claims of Brotherhood members, the court noted that "during the progress of [the] proceeding" the original contingent fee arrangement between "the [attorney], his client, and the Brotherhood" (calling for a single contract for a 20 per cent fee with the attorney, who "turned over one-quarter [thereof] to the Brotherhood") was "somewhat altered in form—as the result of an intimation

judicially imparted at preliminary hearing—so that now the [attorney] procures two contracts, one to secure his 15 per cent. contingent fee, and the other whereby the client employs the Legal Aid Department of the Brotherhood" to do the investigating work on his claim, and "agree[s] . . . to pay it, in accordance with its plan, 5 per cent. of the net settlement, verdict or recovery." (P. 467.) With regard to this ostensible change in the contractual relations of the parties, the court pertinently continued at page 467: "We can see no difference in principle between the use of two contracts and one, where the purpose is to secure for the Brotherhood one-quarter of the contingent fee as a contribution to the Legal Aid Department of which the investigator is a representative." Then after noting the further professional standard of the New York State Bar Association declaring that the "professional services of a lawyer should not be controlled or exploited by any lay agency, personal or corporate, which intervenes between client and lawyer" and so destroys the latter's independence of function with the former, the court rejected the attorney's claim that "the practice in question" might be justified "because of what was written in the case of *Ryan* v. *The Pennsylvania Railroad Co.,*" with this observation (pp. 467-468): "The basis of [that] decision was that the contract was not contrary to public policy, and that the Brotherhood was engaged in rendering an enlightened service to its members . . . [but that] is not the question upon which this court has to pass, which has to do only with the infraction of its rules. . . . It is our conclusion that the [attorney's] unprofessional conduct as indicated has been clearly established, and invites the censure of the court, which is hereby recorded."

Petitioners argue that the contingent fee arrangements here made between the parties are not vulnerable to the prevailing objection in the O'Neill case because the contract in favor of the Brotherhood for 6 per cent of the net recovery was presented to the client not by the attorney but by a representative of the Brotherhood, so that the attorney concerned himself only with his own contract for the 19 per cent allowance. In fact, petitioners admit that this new procedure in handling the two contracts was adopted as the result of the discussion and criticism expressed in the O'Neill case. But the censurable premise of the divided contingent fee contract remained the same. There was no change in the substance of the entire transaction as emanating from the Brotherhood's Legal Aid

Department for the coordinated purpose of supplying to the members the services of investigators and legal counsel. Contracts for the two services were made dependent one upon the other, for, according to the record, petitioners were unable to cite any instance where the injured member ever executed a contingent fee contract with the Brotherhood for the investigation of his case and yet did not at substantially the same time execute a contingent fee contract for legal representation. In short, the two contracts constituted but one overall transaction involving the division of compensation between regional counsel and the Brotherhood as a fee-splitting device contrary to rule 3 of the Rules of Professional Conduct and the requirement that an attorney dissociate himself in his professional employment from control by a lay intermediary or organization.

Petitioners claim that their conduct was approved by this court in the case of *Hildebrand* v. *State Bar* (1941), 18 Cal.2d 816 [117 P.2d 860], where a "charge of solicitation of professional employment" made against petitioner Hildebrand, acting as regional counsel in the representation of an injured railroad man under the auspices of the Brotherhood's Legal Aid Department, was dismissed as not "sufficiently supported by the evidence"—the so-called "Bishop Matter." (Pp. 830, 834.) A reading of that opinion, however, clearly shows that the disciplinary issue there resolved related only to alleged misconduct as correlated with the charge of solicitation of the one case in question, and did not purport to pass upon the general charge of "solicitation of professional employment" pursuant to the basic plan of the Brotherhood in procuring its members to employ designated regional counsel as part of the services rendered by the Legal Aid Department. As so distinguished, the Hildebrand case is not a judicial determination of the precise disciplinary consideration here argued—the propriety of petitioners' contractual relationship with the Brotherhood as a part of the basic service plan of the Legal Aid Department to its members, when attacked as a general overall solicitation of legal employment contrary to established professional standards.

There is no merit to petitioners' further claim that any fee-splitting criticism to which the divided contingent fee contract might be subject is no longer a factor for consideration here, since that arrangement was superseded in June, 1946, by the single contractual stipulation of a 25 per cent contin-

gent fee running wholly in favor of the attorney, who paid therefrom the Brotherhood's investigators on a *quantum meruit* basis. Obviously, in the determination of this disciplinary proceeding petitioners must be held accountable for the practices which existed during the period that they were charged with misconduct. Moreover, under both situations as to fee arrangements the general "channeling" of legal work to petitioners continued as a prevailing procedure embraced in the Brotherhood's undertaking with petitioners. Likewise immaterial is the fact that as of October 15, 1949, petitioner Hildebrand's appointment as "regional counsel for the Brotherhood of Railroad Trainmen" was canceled and terminated. While there may no longer be a "basic contractual arrangement" with the Brotherhood as a present disciplinary problem it is petitioners' prior actions as heretofore discussed which must be examined in the light of the charge of professional misconduct. Nor does the worthiness of the Legal Aid Department as an enterprise established by the Brotherhood to render valuable services to its members in providing the means for appropriate presentation of their damage claims (*In re O'Neill, supra,* 5 F.Supp. 465) or the manner in which the charge of misconduct on the part of petitioners was made to The State Bar obscure the essential issue of petitioners' alleged violation of professional standards by reason of their participation in the basic plan of the Brotherhood as a general scheme for the solicitation of professional employment among members of the Brotherhood.

Petitioners' acts as here assailed in relation to rule 2, section a, and rule 3 of the Rules of Professional Conduct, *supra,* cannot be condoned as consistent with the ethical proprieties exacted of members of the bar in this state. However, in view of the somewhat divergent implications found in the cited cases concerning the Brotherhood's basic plan, and in the absence of any prior decision in this state holding that it was improper for petitioners to participate in such a plan in the manner above described, it is our conclusion that the ends of justice will be served by dismissing the present proceeding without disciplinary action, thereby permitting this opinion, as the first expression of the views of this court upon the subject, to serve prospectively as a guide to the members of the profession generally, rather than to serve retrospectively to the detriment of petitioners.

The proceeding is dismissed.

CARTER, J.—I dissent.

I concur in the judgment of dismissal, but dissent from the holding of the majority that petitioners have violated rule 2, section (a) and rule 3 of the Rules of Professional Conduct of The State Bar of California.

Before discussing the mode of operation of the Brotherhood and petitioners with reference to the legal aid services here involved, it is necessary to examine the background that led to the arrangement between them. It appears that the Brotherhood of Railroad Trainmen is an organization of railroad employees. Those employees agreed that it was advisable to provide some means whereby they could more efficiently handle cases of railroad workmen who were injured in the course of their work. Such claims are certainly not "damage actions" in an ordinary sense for they arise under the Federal Employers Liability Act of Congress (45 U.S.C.A. § 51 et seq.). That act was designed for the protection of railroad employees engaged in interstate commerce who otherwise were left to common law remedies which were wholly inadequate. This act filled the need that workmen's compensation acts accorded to other workingmen and is buttressed by the Safety Appliance Act of Congress (45 U.S.C.A. § 1 et seq.). These acts, however, lack the informality of procedure characteristic of the workmen's compensation acts, as the claims arising thereunder are prosecuted in the courts rather than before a commission and, hence, qualified counsel, as well as competent investigators, are indispensible. The Brotherhood here involved is an organization composed of the persons who are protected by the Federal Employers Liability Act, *supra,* and their employers are subject to its provisions. Hence there is a manifest community of interest between the employees and their organization, which justifies the latter in the procurement of legal and investigation services, all of which directly ties in to the rights and remedies established by the Federal Employers Liability Act. Thus, we do not have a case where the purpose, motive and result is the stirring up or exciting of litigation. Nor do we have a situation where hirelings are used to obtain clients for an attorney who would otherwise have no contact with them. Much less is there any splitting of fees or knowingly obtaining clients for a compensation. It is nothing more than a proper joining of forces for the accomplishment of a proper legal objective of mutual protection.

The arrangement between petitioners and the Brotherhood at the time pertinent as outlined by the majority opinion is

that the Brotherhood and petitioners agreed that the latter were to be counsel for a certain geographical area and be available to handle cases for employee claimants—members of the Brotherhood who suffered industrial injuries in that area. For that service, the contract with the claimant was one agreeing to pay 6 per cent of any recovery to the Brotherhood for its investigation services, and the other to pay 19 per cent to petitioners as their fee for handling the prospective action to recover on the claim. The Brotherhood urged its members to take advantage of the service, although they were not required to do so, and petitioners knew that the members were so urged.

If such a plan subjects the attorney with whom the arrangement is made to disciplinary action for solicitation, as the majority holds, then a rule has been established that will have more far reaching effects than any ever before stated by this court. The ramifications are innumerable. The rule will apply to other professional fields where a similar arrangement must be held to constitute solicitation and, therefore, forbidden. Merely scratching the surface uncovers the universal provision of liability insurance policies under which the insurer agrees to defend the insured in any legal action arising under such a policy and retains control over that litigation, including the employment of an attorney. The fees of the attorney are paid by the insurer out of the premiums it receives from the insured. The insurer advertises for and solicits business—the sale of its policies. It would be folly to suggest that the attorneys employed by such insurers do not know that such is the practice, and it is common knowledge that some attorneys, while not on a salary-employee basis with the insurer, have an arrangement whereby they are regularly retained to defend the insurer's insured. The situation is not distinguishable from the instant case except possibly it may be said that this is a stronger case from the standpoint of professional ethics. Is this court going to discipline all attorneys who are employed by insurance companies to represent their insured?

Reference may also be had to legal aid bureaus for indigent persons. Such bureaus urge the use of the services offered, and the attorney rendering the service knows of such solicitation, yet no one questions the practice. True, the attorney may give his time without charge, but practicing law free is nevertheless practicing law.

It is a matter of common knowledge that such state-wide

organizations as contractors' associations, merchants' associations, cattlemen's associations, etc., employ attorneys to represent such organizations and furnish advice to individual members of such organizations on matters of general and common interest, and that under the arrangement between these organizations and the attorneys employed by them, such attorneys handle cases for individual members of such organizations who may be referred to such attorneys by representatives of such organizations on a fee arrangement agreed upon between such organization and the attorneys so employed, and if the problem involved in any such case is of general or common interest to the members of the organization, the latter will pay a portion if not all of the fee and expenses incident to the handling of such a case. It is obvious that under such an arrangement the representative of such organization solicits the member to take his case to the attorney for the organization, and the representative of the organization is paid out, of funds derived from the contributions of members thereof. This is a common practice and I have never heard of its being attacked as unethical or a violation of the Rules of Professional Conduct of The State Bar of California. Under the rule announced in the majority opinion, any attorney employed by such an organization who accepts employment from a member of such organization, who was referred to such attorney by the paid representative of such organization, would be guilty of unprofessional conduct and subject to discipline for a violation of the rule of professional conduct here involved.

In the medical practice field we have such organizations as the Ross-Loos plan (25 Cal.L.Rev. 95) where doctors have joined in a plan to give medical care for persons at a fixed amount. Patient members of such a plan are probably solicited. There are countless other such arrangements. (See *California Physicians' Service* v. *Garrison,* 28 Cal.2d 790 [172 P.2d 4, 167 A.L.R. 306].) Colleges and universities commonly supply medical care for their students and a fee is charged therefor. The attendance of such students may have been solicited.

The application of the rule announced in the majority opinion will destroy all of the foregoing plans and systems, as well as many others. I cannot believe that the rules of ethical conduct have any such purpose or design. The essential object of the instant plan *is not to obtain clients for an attorney.* It is to enable the organization (the Brotherhood) to assist its members in a matter of vital concern to them.

It does not urge its members to avail themselves of the services in order to bring business to the counsel, or to "stir up" litigation. It is a method by which an attorney may be employed at a lesser fee, one whose special qualifications are previously determined. Certainly the attorney is not soliciting business any more than would an attorney who agreed to represent a whole group of persons. The Brotherhood is not soliciting for him. It does not care whether he gets business and profits thereby. It is primarily concerned with assisting its members or, phrased otherwise, it is nothing more than a group of persons who are interested in protecting themselves in the event of injury. It is merely incidental that in so doing a benefit results to the attorney.

The entire field must be examined in this matter rather than summarily brushing aside many organizations and arrangements which are serving a definite social need. The needs and policy underlying the plan of the Brotherhood are very pertinent. The majority opinion states: "Nor does the worthiness of the Legal Aid Department as an enterprise established by the Brotherhood to render valuable services to its members in providing the means for appropriate presentation of their damage claims . . . obscure the essential issue of petitioners' alleged violation of professional standards by reason of their participation in the basic plan of the Brotherhood as a general scheme for the solicitation of professional employment among members of the Brotherhood." I cannot agree with the foregoing declaration, as it must be remembered that here the court *is not applying a legislative enactment over which it has no control and with the wisdom of which it cannot be concerned.* On the contrary, it is supreme in the field of attorney-disciplinary matters. (*Brydonjack* v. *State Bar,* 208 Cal. 439 [281 P. 1018, 66 A.L.R. 1507]; 9 Cal.Jur. 10-Yr.Supp., Practice of Law, §§ 4, 40-42.) It is not merely mechanically interpreting and applying a rule of ethics over which it cannot concern itself. Indeed, it is its duty to examine into the wisdom of the rule, and observe its effect under various circumstances. Particularly it is bound to consider the scope of its application and all the questions of policy necessarily involved in such process. Certainly this court should not blind itself to the situation existing with respect to the plight of the injured railroad workmen who may be ignorant of their rights and fall victims to lay claims agents of railroad companies who are bound by no rules of ethics or professional conduct.

In endeavoring to meet the contention that a violation of the rule requires that the solicitor (the Brotherhood) receive compensation for its solicitation, the majority states: "(1) it was a matter of concern to the Brotherhood that the lawsuits of its injured members be handled by experienced lawyers, and the basic plan with petitioners was designed to provide legal services for its members at what might be termed 'wholesale rates'; and (2) such service would reasonably constitute an inducing cause for attracting membership in the Brotherhood and the payment of dues thereto." An obvious answer to that argument is that those benefits were not received by the Brotherhood *for obtaining clients for petitioners*. They were received as the incident of the plan to provide competent legal services for its members.

The authorities support the proposition that the arrangement here considered violates no rule of professional ethics. In *Ryan* v. *Pennsylvania R. Co.*, 268 Ill.App. 364, the same plan was involved. Contrary to the majority opinion, the basis of that case *was not that the contract for attorneys' fees was not against public policy*. The contract was held valid because *there was no breach of ethics by the attorney*. The court, after outlining the Brotherhood's plan, stated: "Respondent contends that 'the appellee is not entitled to an attorney's lien *because* the contract on which his claim *is based was secured by unlawful and unethical solicitation and fee-splitting,*' that 'the proof showed that there was a well organized plan or scheme by which appellee Attorney Joseph D. Ryan obtained many personal injury cases through the solicitation of the Brotherhood of Railroad Trainmen and its investigators,' and that 'it is clear that appellee Ryan obtained the Meadows case through the unlawful and unethical solicitation by the Brotherhood of Railroad Trainmen and its investigators'; that it 'can see no difference from the standpoint of legality and ethics between an individual ambulance chaser soliciting personal injury claims, and a corporation and its investigators investigating the cases of proposed claimants and influencing said claimants to retain their Regional Counsel.' After a careful consideration of all the facts we are satisfied that *these contentions* and arguments are without merit, and we feel impelled to say that *the assertion that the Brotherhood, through its legal aid department, is akin to an ambulance chaser and that the petitioner was a beneficiary of an unethical and unlawful system of obtaining clients, is unworthy of the able lawyers who made it*. The Brotherhood

is a labor organization, composed of men engaged in hazardous occupations and who are banded together for mutual protection and advancement. The evidence establishes that it organized the legal aid department for the sole purpose of protecting its injured members or their families in the matter of claims growing out of injuries sustained in the course of employment. The argument that the legal aid department was a solicitation scheme by which petitioner 'obtained many personal injury cases' is a *most unfair one* and entirely unwarranted under the evidence. The evidence, *introduced by respondent*, shows clearly the worthy purpose of the department and the necessity for its organization and maintenance. The instant case is an illustration of its benefit to the members . . . Such an arrangement was not unethical.'' [Emphasis added.]

*In re O'Neill*, (Dist. Ct. E.D.N.Y., 1933) 5 F.Supp. 465, misinterprets the Ryan case, and fails to give consideration to the true nature of the plan.

Finally, there is no splitting of fees under the plan. The contract for the 6 per cent for investigation fee *runs to the Brotherhood*. The attorney has nothing to do with it. To assume that it is part of his fee is contrary to the facts. The situation is no different than if each member would execute a contract with the Brotherhood that in the event he used the services of the Brotherhood at any time in the future he would pay therefor 6 per cent of his recovery. In either case the relation between that charge and the attorney's fees for his services is wholly independent.

In holding that the Brotherhood cannot arrange with an attorney to represent its members who may suffer industrial injuries when such members are referred to such attorney by a paid representative of the Brotherhood, the majority of this court have struck a lethal blow at one of the most vital functions of the Brotherhood as a labor organization. It was largely through the effort of the Brotherhood that the Federal Employers Liability Act was enacted by Congress. This act has been amended many times at the suggestion of the Brotherhood in order to accomplish its ultimate objective of extending the greatest possible measure of protection to railroad workmen engaged in interstate commerce. It is obvious that this objective will be defeated unless the Brotherhood may now see that those members entitled to the protection afforded by the act are informed as to what to do to gain such protection. The first step in this direction is the selection of a competent

attorney and the ascertainment of the facts which constitute the basis of the claim which the injured workman must assert in order to establish liability for his injuries. The Brotherhood, through its legal aid department, has sought to provide the essential means necessary to secure to its members the protection afforded by the act. In so doing, it has done no more than many other organizations which have employed counsel to protect the interests of their members. In my opinion, such arrangements should not be condemned as unethical. The organization has an interest in the social and economic welfare of its members. It cannot be denied that the social and economic welfare of every railroad workman and his dependents is imperiled when he suffers injury or death in the course of his employment. Any concept of ethics which would deny to such an organization the right to suggest to such injured workman, or his dependents in case of his death, that he or they consult an attorney, is not worthy to be known by that name, and the mere fact that the organization has arranged with such attorney to handle cases for its members on a reduced fee basis should not render such arrangement unethical. The foregoing considerations should dispose of this proceeding as a misguided venture in the field of legal ethics. Petitioners have done no wrong in entering into the arrangement in question with the Brotherhood, and in the handling of cases referred to them by representatives of the Brotherhood pursuant to such arrangement.

The proceeding against petitioners should therefore be dismissed.

TRAYNOR, J.—In 1929 the Brotherhood of Railroad Trainmen undertook an investigation of the settlements and recoveries its members were receiving under the Federal Employers Liability Act for injuries incurred in the course of their employment. This investigation disclosed that the workers were not receiving the full benefits to which they were entitled because of their unfamiliarity with their rights and their frequent premature release of claims at the persuasion of railroad claims adjusters, together with incompetent and overpriced legal assistance. It appeared that the situation would become worse because of a nation-wide drive to suppress ambulance chasing attorneys, who, incompetent or overreaching as they might be, frequently provided the only effective check upon the activities of the claims adjusters. Accordingly, to protect its members both from precipitous settlement of claims

and ambulance chasing attorneys, the Brotherhood in 1930 established its Legal Aid Department to acquaint members with their rights, and to investigate accidents to unearth the necessary evidence. It was essential to these purposes to have competent attorneys available at reasonable fees. The Brotherhood therefore secured the agreement of such attorneys throughout the country to accept the cases of injured members at a reasonable contingent fee, with the understanding that the Brotherhood would recommend the attorneys to its injured members who would be free to retain them or not. Thus, a group with a legitimate need for competent legal assistance in a specialized class of cases common to it, solicited the assistance of qualified attorneys at reasonable fees. It is conceded that members of the Brotherhood have thereby been able to secure adequate legal assistance in presenting their cases under the Federal Employers Liability Act. The issue is whether the attorneys may participate in the Brotherhood's plan without violating the Rules of Professional Conduct.

Given the primary duty of the legal profession to serve the public, the rules it establishes to govern its professional ethics must be directed at the performance of that duty. Canons of ethics that would operate to deny to the railroad employees the effective legal assistance they need can be justified only if such a denial is necessary to suppress professional conduct that in other cases would be injurious to the effective discharge of the profession's duties to the public.

It is contended that the Brotherhood's attorneys are violating rule 2 prohibiting the solicitation of professional employment and rule 3 prohibiting acceptance of employment channeled to the attorney by an organization "that for compensation controls, directs or influences such employment. . . ." It is necessary to consider against what evils these rules are directed and whether the operation of a plan such as that inaugurated by the Brotherhood involves the danger of such evils.

These rules raise the familiar problems of advertising and ambulance chasing. Advertising has generally been discountenanced by the profession (American Bar Association Canon of Professional Ethics No. 27) as undignified and misleading. Advertising is hardly a measure of competence, given the profession's long standing disapproval of it. Clients who need legal assistance only rarely and are therefore inexperienced in selecting counsel, may be induced by advertising to select unsuitable counsel, with consequent injury not only to

themselves but to the reputation of the bar as a whole. (See Llewellyn, The Bars' Troubles and Poultices—and Cures?, 5 Law and Contemporary Problems 104, 116.)

Direct solicitation by ambulance chasing has led to serious abuses. "The testimony demonstrates very clearly the evils of the system of ambulance chasing. Competition between 'ambulance chasers,' and between 'ambulance chasers' and attorneys, in procuring cases, visits to homes and hospitals to procure retainers at unseemly hours, and when the injured person or the members of his family were in no mental condition to enter into contracts for the engagement of lawyers' services, division of fees with solicitors and procurers, payment of moneys to officials, doctors, and others for help in procuring cases, the use of photographs of checks of amounts of recoveries had, and newspaper clippings showing successes in court, for the purpose of procuring clients, are all laid bare." (*Matter of Gondelman*, 225 App.Div. 462 [233 N.Y.S. 343, 346].)

While rule 2 is directed against the solicitation of professional employment by an attorney, rule 3 is concerned with the lay intermediary between attorney and client who seeks to profit from the solicitation, control, or influence of professional employment. A profit-motivated lay agency may exert various harmful influences on the profession. It may be more interested in the profit to be derived from legal business than in the best interests of the clients. Thus lay ambulance chasers who solicit cases and then sell them to attorneys are apt to seek out, not the most competent attorney, but the one who will pay the most for a case. It may be more profitable for professional ambulance chasers to operate on a high-volume low-return basis than to consider the best interests of each client. (See Nationwide War on "Ambulance Chasers," 14 Amer. Bar Ass'n Journal 561, 563.)

Again, a lay agency may direct its clients to attorneys who will in turn recommend the services of the agency, even though the client may not need them. Thus a trust company in recommending attorneys to draft wills may favor those who recommend trust provisions. (See Cohen, Fiduciaries and Lawyers, 7 Ind.L.Jour. 295, 306-308, reprinted in Costigan, Cases on the Legal Profession [2d ed.] 364-366.) It may not be in the client's interest to incorporate trust provisions in his will, but if the attorney is receiving the business through the recommendation of a trust company, he may be influenced by that fact. A rule prohibiting the acceptance of business

channeled to him by a party whose interest in his services may be adverse to those of the clients is justified to insure that the clients' interests are kept paramount.

The lay intermediary may also interfere with the direct attorney-client relationship. Thus, if an association retains an attorney to advise on problems presented by the members, and those problems are communicated to the attorney through the association, he may be constrained to give advice in the light, not of all the facts, but of only the information thought relevant by the member who requested advice of the association. (See American Bar Association, Opinions of the Committee on Professional Ethics and Grievances [1947] No. 98, p. 212.)

There are situations, however, when an attorney's association with a lay organization fulfills a legitimate interest of the organization or its members, and presents no risk of conflicting interests or other abuses. Such arrangements may be tolerated even when the lay agency is actively engaged in soliciting business. Liability insurance companies provide in their policies that they will arrange for the defense of any action brought against the policy holder and demand that they shall have the right to do so. By advertising their policies they solicit the legal business that arises from their policy holders' activities. At the same time they arrange with qualified experts in personal injury litigation to represent them and their policy holders in any litigation that arises. These attorneys agree to this representation, knowing that their professional employment will arise from the active solicitation of business by the insurance companies. Such conduct on the part of the attorneys is expressly permitted by rule 3, for it is accepted as serving the public good. Liability insurance is socially desirable; policy holders and the companies are entitled to adequate legal representation; the sensible way to provide such representation is through regularly-retained experts. There is no risk that clients will be led to incompetent attorneys, and the attorneys are in a position to deal directly with the client when the need for legal services arises. Moreover, the interests of the insurance company and the client will ordinarily coincide, so that there is little danger that the insurance company's attorney will be placed in the position of representing conflicting interests. It has been thought better to make adjustments for the occasional case where the interests of the policy holder and the company conflict (see *O'Morrow* v. *Borad,* 27 Cal.2d 794, 798-799 [167 P.2d

483, 163 A.L.R. 894]), than to prohibit the practice altogether.

The Brotherhood's attorneys bear much the same relation to it as the insurance defense attorneys do to the insurance companies. In neither situation do the attorneys themselves solicit professional employment or pay the organizations involved for securing it, even though they reap the benefits of the activities of the respective organizations that bring professional employment to them. Rule 3 recognizes that it is the financial interest of the insurance company that renders the employment of the company's expert attorneys for its policy holders "necessary and proper for the protection of such financial interest." It illustrates a situation where considerations of policy make clear that there are no ethical objections to the channeling of professional employment to experts. Rule 3 and the policy underlying it do not close the door to similar practices in other situations where policy considerations are as strong or stronger in favor of the propriety of group action. Rule 3 requires a financial interest in the outcome of litigation to justify referrals only when the association controls, directs, or influences such referrals for compensation. It is thus designed to preclude attorneys from accepting employment from organizations engaged in the business of providing legal advice for profit. It does not prohibit the acceptance of employment where the referring association makes the referrals, not for compensation, but solely to help its members secure legal assistance.

Bar association committees on professional ethics have recognized that the protection of various social or group interests justifies attorney participation in plans designed to protect the legitimate interests of the group, even though the attorney is retained by a group that recommends his services to its members or others on problems they have in common. Thus it has been considered proper for the National Lawyers Committee of the American Liberty League publicly to offer to defend the constitutional rights of those threatened by New Deal legislation. "These issues transcend the range of professional ethics." (American Bar Association, Opinions of the Committee on Professional Ethics and Grievances [1947] No. 148, pp. 307, 311.) Similarly, the same organization has approved the use of expert counsel by trade organizations to assist their members in conducting their businesses within the framework of increasing governmental regulation. (Opinion No. 168, p. 340; see, also, Opinion No. 273, p. 569; Questions and Answers of the Committee on Professional Ethics of the

New York County Lawyers Association, Question 47, reprinted in Costigan, Cases on the Legal Profession [2d ed.] 366; Relation of Lawyers and Lawful Trade Organizations and other Organizations, Opinion of the Committee on Professional Ethics of the New York County Lawyers Association, reprinted in Costigan, *supra,* 360.) These opinions have recognized that in those cases where the members of lay associations have problems in common, it is proper for their associations to arrange for competent legal assistance, even though to carry out the plans the associations must make known to their members the identity of competent counsel. Thus a bankers' association may recommend its expert counsel to its members when they are faced with legal problems peculiar to the banking business, or a medical association may adopt a similar procedure for the benefit of its members.

It does not follow that an attorney may participate in a plan by which the association itself engages in the practice of law. " '[A]s the term is generally understood, the practice of law is the doing and performing [of] services in a court of justice in any matter depending therein throughout its various stages and in conformity with the adopted rules of procedure. But in a larger sense it includes legal advice and counsel and the preparation of legal instruments and contracts by which legal rights are secured although such matter may or may not be depending in court.' " (*People* v. *Merchants Protective Corp.,* 189 Cal 531, 535 [209 P. 363].) Corporations and associations of unlicensed persons are denied the right to practice law:

"The essential element underlying the relation of attorney and client is that of trust and confidence of the highest degree growing out of the employment and entering into the performance of every duty which the attorney owes to his client in the course of such employment. It is the existence of this essential element as the basis of said relation which has called into being the various statutory regulations governing the admission of attorneys and counselors at law and which embody certain requirements of character, integrity and learning as the prerequisites of such admission to the right and privilege of practicing law. It is the possession or reputation for the possession of these personal qualifications which constitutes, as a rule, the main inducement for the formation of the personal and confidential relation of attorney and client. The intervention of a corporation between the membership it secures and the attorneys it employs, which corporation can in

and of itself possess none of these qualifications, obviously leaves out of view the necessity for their existence. The essential relation of trust and confidence between attorney and client cannot be said to arise where the attorney is employed, not by the client, but by some corporation which has undertaken to furnish its members with legal advice, counsel and professional services. The attorney in such a case owes his first allegiance to his immediate employer, the corporation, and owes, at most, but an incidental, secondary and divided loyalty to the clientele of the corporation." (*People* v. *Merchants Protective Corp.*, 189 Cal. 531, 539 [209 P. 363]; see, also, *In re Co-operative Law Co.*, 198 N. Y. 479 [92 N.E. 15, 139 Am.St.Rep. 839, 19 Ann.Cas. 879, 32 L.R.A.N.S. 55]; Bulleit, The Automobile Clubs and the Courts, 5 Law and Contemporary Problems 22.)

In the present case, however, it is not contended that the Brotherhood is engaged in the practice of law, and there is no evidence of evils that the Rules of Professional Conduct are intended to guard against. The Brotherhood's plan in no way lowers the dignity of the profession. It does not lead the railroad employees to incompetent counsel. There is no conflict in the interests of the Brotherhood and its members, and therefore no danger that the attorneys recommended by the Brotherhood will be faced with conflicting allegiances. There is no interference with the direct attorney-client relationship; the members are free to retain or reject the attorneys recommended by the Brotherhood and they deal directly with the attorneys themselves.

Since there is no issue of misconduct other than participation in the basic plan of the Brotherhood, I concur in the judgment dismissing the proceeding.