(Nonrecord No. 751.)

*In re* Brotherhood of Railroad Trainmen.

*Opinion filed March 20, 1958—Rehearing denied May 23, 1958.*

Thomas J. Boodell, and Wayland B. Cedarquist, both of Chicago, for the American Bar Association; Charles E. Feirich, of Carbondale, and Wade F. Baker, of Springfield, for the Illinois State Bar Association; and Charles Leviton, (Augustine J. Bowe, John Ligtenberg, and Werner W. Schroeder, of counsel,) all of Chicago, for the Chicago Bar Association.

William C. Wines, of Chicago, for the Brotherhood of Railroad Trainmen.

Harold A. Smith, of Chicago, Karl C. Williams, of Rockford, and Calvin P. Sawyier, of Chicago, for intervening railroads.

Per Curiam: A motion was made on behalf of the Brotherhood of Railroad Trainmen for leave to file in this court an original petition for a declaratory judgment. The motion and petition described certain conduct of the Brotherhood and the lawyers who serve as regional counsel for its legal aid department and requested a ruling that the conduct described was neither illegal nor unprofessional. The motion disclosed that disciplinary proceedings were pending against Edward B. Henslee, general counsel for the Brotherhood, and a regional counsel for its legal aid

department, and three of his associates, Edward B. Henslee, Jr., Walter N. Murray and Frank H. Monek.

The questions raised by the petition had not heretofore been considered by the court. And because this court both formulates and enforces the standards governing the practice of law (*In re Application of Day,* 181 Ill. 73,) we were of the opinion that before a ruling of any kind should be made, an investigation into the practices in question should be conducted. The motion for leave to file was therefore denied, but at the same time the court, on its own motion, appointed the Honorable Charles H. Thompson, a former justice of this court, as special commissioner, "with power to inquire into and take proof of all relevant factual matters and to report the testimony, together with the applicable principles of law, to the Chief Justice."

Thereafter hearings were conducted by the special commissioner. The Brotherhood of Railroad Trainmen, the Illinois State and Chicago Bar associations, and a group of twenty-seven railroad companies participated in the hearings by their counsel. At the conclusion of the hearings briefs were filed on behalf of these parties and also on behalf of the American Bar Association. The special commissioner's report and the briefs are now before the court.

There is no serious dispute as to the basic facts. In 1930 the Brotherhood established its "Legal Aid Department." It took this step because it felt that under pressure from railroad claim agents, the claims of its members resulting from injuries they suffered in their work were being settled for unfair amounts. Some of the railroads forced settlements by the threat of loss of employment. At the same time, the members were being solicited by lawyers of varying degrees of competence who sought to, and did, handle the claims of members for contingent fees that sometimes ran as high as fifty per cent of the amount recovered.

As it presently operates, the legal aid department of the Brotherhood maintains a central office in Cleveland, Ohio,

at the national headquarters of the Brotherhood. In that office it has a staff consisting of a chief clerk, a research analyst, three stenographers and a file clerk. It also has a number of regional investigators. The Cleveland office serves as a clearing house which receives reports from all Brotherhood Lodges of instances in which members have been injured or killed in railroad accidents. It notifies the appropriate regional investigator and regional counsel of all accidents.

Operating in conjunction with the legal aid department are sixteen lawyers, each designated by the Brotherhood as a regional counsel for the legal aid department. The regions tend to follow railroad system lines, rather than geographical lines. For example, Edward B. Henslee, the regional counsel with offices in Chicago, is assigned a region that includes all members employed by railroads in Ohio, and the members employed by certain railroads in Pennsylvania, Michigan, Indiana and Illinois. The dominant considerations in the selection of regional counsel are the Brotherhood's confidence in the ability of the attorney, plus the prospect of high jury verdicts in the city where his office is located.

By agreement with the Brotherhood the attorneys who are designated as regional counsel charge a fee of twenty-five per cent of the amount recovered in each case, whether recovery is by settlement or by judgment. Regional counsel have also agreed to and do pay all court costs, investigation costs, costs of doctors' examinations, expert witness fees, transcript costs and the cost of printing briefs on appeal. They also pay the total cost of operating the legal aid department of the union. All expenses of the legal aid department are apportioned among the sixteen regional counsel in the ratio that their respective gross fees bear to the total gross recoveries throughout the country. Periodically throughout the year the legal aid department assesses each regional counsel for his proportionate share of the total

cost, and at the end of each year each regional counsel is billed for the balance of his assessment. The Brotherhood maintains a practice of apportioning the very high expenses of its conventions among its various "departments" on the basis of the amount of time spent in discussing, on the floor of the convention, the affairs of that department. The legal aid department's share of this cost is assessed against and paid by the regional counsel.

The Brotherhood constitution requires that each local lodge appoint someone whose duty it is to fill out an accident report whenever a member is injured, and also to make contact with the injured man, or the relatives of a man who is killed, and make it known that legal advice will be given free of charge by the regional counsel. He also makes known the availability of regional counsel to handle the claim and any ensuing litigation for a total charge of twenty-five per cent of the amount recovered by settlement or by litigation. The twenty-five per cent includes all expenses of investigation and litigation.

The lodge member who investigates the occurrence and makes contact with the injured man recommends and urges that regional counsel be consulted and employed. These men carry blank copies of contracts employing the regional counsel's firm as attorneys. The regional investigators employed by the legal aid department also carry these contracts. If a signed contract is not obtained by an investigator in the field, an investigator often brings the interested parties to the office of the regional counsel in Chicago. The injured man may be accompanied by his wife, and if the interested party is a widow, the wife of the investigator also makes the trip. The expenses of these trips are paid immediately by regional counsel. The lodge member who investigates and urges the employment of regional counsel is also compensated by regional counsel at his regular hourly wage rate for time spent in investigating the case and in making the trip to Chicago. These amounts are paid whether or not

the regional counsel is retained, and regardless of the ultimate outcome. In addition, Mr. Henslee testified, "There are many times when one of the boys will bring in a case, and taking care of the investigation, etc., they are given a gratuity of $100 or $150."

The Brotherhood defends its practices on legal grounds, and also argues that they are justified by policy considerations. As a matter of law it argues that its method of handling the personal injury and death claims of its members is permissible because under the Railway Labor Act the Brotherhood is authorized to represent its members, before the National Railroad Adjustment Board or other appropriate tribunals, in the processing of disputes growing out of grievances. (45 U.S.C. 152.) But these injury and death claims are not the kind of labor disputes that the statute contemplates. We find nothing to suggest that Congress intended by the Railway Labor Act, any more than by the Labor Management Relations Act, (29 U.S.C. 141) to overthrow State regulation of the legal profession and the unauthorized practice of the law.

The Brotherhood also points to the fact that insurance companies are permitted to take over completely the defense of claims against their policy holders, and suggests that the interest of the members of the Brotherhood in legal developments in Federal Employers' Liability Act cases, and particularly in developments with respect to the amount of damages recoverable in those cases, is sufficiently intimate that it is warranted in taking an active role in the prosecution of these cases. The argument is unsound. The interest of the insurance company is of a different kind. The money involved is its money, and for that reason some States permit an action to be maintained directly against it. And the interest of the Brotherhood in the individual claims of its members does not authorize it to engage in the active solicitation of those claims for particular lawyers who finance the solicitation.

The policy argument that the Brotherhood makes, based upon facts that are peculiar to it and to its members, is more persuasive. Railroading is a hazardous business in the course of which many men are injured, and the injuries are frequently very serious. The members of the Brotherhood include switchmen, who perform the most hazardous part of railroad work. In the past the claim agents of some of the railroads have been aggressive in their efforts to settle the claims of injured trainmen for the smallest amounts possible regardless of fairness and adequacy. And while there is evidence that some railroads are moving away from this policy, there is also evidence that undesirable practices persist. The Brotherhood insists that injured trainmen, and the representatives of deceased trainmen, who are unversed in the law, are entitled to procedures that will insure that they receive competent legal advice for reasonable fees. It points out that any advice or service rendered by the regional counsel relates only to matters arising out of personal injuries incurred during the course of employment.

While these considerations have weight, they are insufficient in our opinion to override the principles that must govern the members of the legal profession in their relations with clients. Several courts have considered, in varying contexts, the activities of the legal aid bureau and its regional counsel. (*Hildebrand* v. *State Bar of California,* 36 Cal.2d 504, 225 P.2d 508; *Atchison, Topeka & Santa Fe Railway Co.* v. *Jackson,* 235 F.2d (C.C. 10) 390; *In re O'Neill,* 5 F. Supp. (D.C.E.D.N.Y.) 465; *Doughty* v. *Grills,* 37 Tenn. App. 63, 260 S.W.2d 379; cf. *Ryan* v. *Pennsylvania Railroad Co.* 268 Ill. App. 364.) With the exception of the *Ryan case,* all of them have expressed disapproval. The *Ryan case* was based primarily on the Appellate Court's appraisal of public policy. It did, however, approve practices of the Brotherhood which do not differ in substance from those here involved.

While this matter was pending the General Assembly enacted a statute that expressed a policy contrary to that stated in the *Ryan case*. It provided: "It shall be unlawful for any person not an attorney at law to solicit for money, fee, commission, or other remuneration directly or indirectly in any manner whatsoever, any demand or claim for personal injuries or for death for the purpose of having an action brought thereon, or for the purpose of settling the same." (Ill. Rev. Stat. 1957, chap. 13, par. 15.) As originally introduced the Bill contained the following provision: "Nothing herein shall be construed to prevent any bona fide labor organization or any member thereof from securing advice for any member of such organization in regard to his rights except that only an attorney may give legal advice." This provision was stricken by amendment in the House, and an attempt to reinstate it was defeated in the Senate.

What has been said would ordinarily be sufficient. The Brotherhood, however, has frankly and openly placed its problem and its own solution of it before the court, and asked for guidance. We think, therefore, that it is appropriate to indicate in broad outline what the Brotherhood may do with respect to the injury and death claims of its members.

The objective of the Brotherhood in seeking to secure competent legal representation of its members can be accomplished without lowering the standards of the legal profession. The Brotherhood has a legitimate interest in investigating the circumstances under which one of its members has been injured. That interest antedates the occurrence of any particular injury. We are of the opinion that the Brotherhood may properly maintain a staff to investigate injuries to its members. It may so conduct those investigations that their results are of maximum value to its members in prosecuting their individual claims, and it may make the reports of those investigations available to the injured man

or his survivors. Such investigations can be financed directly and without undue burden by the 218,000 members of the Brotherhood.

The Brotherhood may also make known to its members generally, and to injured members and their survivors in particular, first, the advisability of obtaining legal advice before making a settlement and second, the names of attorneys who, in its opinion, have the capacity to handle such claims successfully. Its employees, however, may not carry contracts for the employment of any lawyer, or photostats of settlement checks. No financial connection of any kind between the Brotherhood and any lawyer is permissible. No lawyer can properly pay any amount whatsoever to the Brotherhood or any of its departments, officers or members as compensation, reimbursement of expenses or gratuity in connection with the procurement of a case. Nor can the Brotherhood fix the fees to be charged for services to its members. The relationship of the attorney to his client must remain an individual and a personal one.

The course thus outlined, if adopted, will make it possible for the Brotherhood to achieve its legitimate objectives without tearing down the standards of the legal profession. If in the future the claims of its injured members are solicited by lawyers, or if the fees charged by lawyers are excessive, the remedy of the Brotherhood will lie by way of complaint to the grievance committee of the appropriate bar association, rather than by way of a competing system of solicitation.

So far as the disciplinary aspects of the matter are concerned, we are of the opinion that because of the decision of the Appellate Court in *Ryan* v. *Pennsylvania Railroad Co.* 268 Ill. App. 364, proceedings looking toward the imposition of discipline should not be pursued. (*In re Luster,* 12 Ill.2d 25.) For the same reason we are of the opinion that time should be allowed the Brotherhood to reorganize its legal aid department along the lines outlined in this

opinion. The standards here stated will therefore become effective on July 1, 1959.