*141 MR. Justice Clark,
whom Mr. Justice Harlan joins,
dissenting.
By its decision today the Court overthrows state regulation of the legal profession and relegates the practice of law to the level of a commercial enterprise. The Court permits a labor union — contrary to state law — to engage in the unauthorized practice of soliciting personal injury cases from among its membership on behalf of 16 regional attorneys whom its president has placed on the union’s approved list. Local officials of the union call on each member suffering an injury and seek to secure employment of these approved attorneys in the prosecution of claims for damages arising therefrom. Moreover the union, through its president, not only controls the appointment and dismissal of the approved attorney but also has considerable influence over his fees and often controls the disposition of cases. Furthermore, from 1930 to at least 1959, the union had required these approved attorneys to pay to it a portion of their fees, usually 25%. Such an arrangement may even now be in effect through the ruse of reimbursement for investigatory services rendered by the union. This state of affairs degrades the profession, proselytes the approved attorneys to certain required attitudes and contravenes both the accepted ethics of the profession and the statutory and judicial rules of acceptable conduct.
The Court excuses the practice on the policy ground that the union membership needs a corps of attorneys experienced in personal injury litigation because ordinary “lawyers [are] either not competent to try these lawsuits against the able and experienced railroad counsel or too willing to settle a case for a quick dollar.” To me this is a serious indictment of the profession. In the cases that I have passed on here — numbering about 177 during the past 15 years — I dare say that counsel for the railroad employee has exhibited advocacy not inferior to that of *142 his opponent (although I do not remember that any one of the 16 approved attorneys appeared in these cases). Indeed, the railroad employee has prevailed in practically all of the cases and the recoveries have ranged as high as $625,000. See Gallick v. Baltimore & Ohio R. Co., 372 U. S. 108 (1963); Transcript of Record, p. 7. Under these facts the Court’s rationale will not stand up, even as a policy ground for approving this patent violation of the cardinal ethics of our profession and flagrant disobedience to the law of most of our States.
The Court depends upon NAACP v. Button, 371 U. S. 415 (1963), to support its position. But there the vital fact was that the claimed privilege was a “form of political expression” to secure, through court action, constitutionally protected civil rights.[1] Personal injury litigation is not a form of political expression, but rather a procedure for the settlement of damage claims. No guaranteed civil right is involved. Here, the question involves solely the regulation of the profession, a power long recognized as belonging peculiarly to the State. Button, as well as its ancestry cited by the majority in the footnotes, is not apposite.
Finally, no substantive evil would result from the activity permitted in Button. But here the past history of the union indicates the contrary. Its Legal Aid Department (now the Department of Legal Counsel) was set up in 1930 for the admitted purposes of advising members “relative to their rights respecting claims for damages” and assisting them “in negotiating settlements . . . .” The Department had a complete reporting service on all major *143 injuries or deaths suffered by its members, regional investigators to whom such reports were referred, and the 16 approved regional counsel (many of whom remain the same today) to whom the cases were channeled for prosecution and who split their fees with the union. And, what is of even more significance, the trial court in this case found “that the defendant Brotherhood still adheres to the pattern and design of the plan formulated and implemented in 1930.”
The union admits that it did operate in this manner until 1959 but says that it has now reformed its operation. But the record shows that this identical union plan has been before several other courts[2] and, while the union has repeatedly promised to reform, as here, it has consistently renewed the same practices. But even if the union has sincerely reformed, which I doubt, the plan it now proposes to follow is subject to the same deficiencies. It includes: the approval of 16 regional attorneys by the president of the union, who also has power to discharge them at his pleasure; the solicitation of all injured members by the local officials of the Brotherhood who urge the employment of an approved counsel; the furnishing of the name of the approved counsel to the injured brother as the only attorney approved by the Brotherhood; the furnishing of the names and addresses of injured members to the approved attorneys; the furnishing of investigative services to the approved attorney, the cost of which, it is indicated, comes from the fees received by the latter; and, finally, the “tooting” of the approved attorneys in union literature and meetings.
*144 I do not read the decree approved by the State as prohibiting union members from recommending an attorney to their brothers in the union. Virginia has sought only to halt the gross abuses of channeling and soliciting litigation which have been going on here for 30 years. The potential for evil in the union’s system is enormous and, in my view, will bring disrepute to the legal profession. The system must also work to the disadvantage of the Brotherhood members by directing their claims into the hands of the 16 approved attorneys who are subject to the control of one man, the president of the union. Finally, it will encourage further departures from the high standards set by canons of ethics as well as by state regulatory procedures and will be a green light to other groups who for years have attempted to engage in similar practices. E. g., Chicago Bar Assn. v. Chicago Motor Club, 362 Ill. 50, 199 N. E. 1; Rhode Island Bar Assn. v. Automobile Service Assn., 55 R. I. 122, 179 A. 139; cf. Semler v. Oregon State Board of Dental Examiners, 294 U. S. 608 (1935); Williamson v. Lee Optical of Oklahoma, Inc., 348 U. S. 483 (1955).

 “In the context of NAACP objectives, litigation is not a technique of resolving private differences; it is a means for achieving the lawful objectives of equality of treatment by all government, federal, state and local, for the members of the Negro community in this country. It is thus a form of political expression.” NAACP v. Button, supra, at 429.

 E. g., In're Petition of Committee on Rule 28 of the Cleveland Bar Assn., 15 Ohio L. Abs. 106 (1933); In re Brotherhood of Railroad Trainmen, 13 Ill. 2d 391, 150 N. E. 2d 163 (1958); In re O’Neill, 5 F. Supp. 465 (E. D. N. Y. 1933); Young v. Gulf M. & O. R. Co., No. 3957 (E. D. Mo. 1946); Reynolds v. Gulf M. O. & Texas Pac. R. Co., No. 772 (E. D. Tenn. 1946); North Carolina ex rel. McLean v. Hice, Superior Ct. of N. C., County of Buncombe (1948).