## CHANCERY COURT OF THE CITY OF RICHMOND

Commonwealth of Virginia
ex rel. Virginia State Bar

v.

Brotherhood of Railroad Trainmen

January 15, 1965

By JUDGE WILLIAM A. MONCURE, JR.

The Bill of Complaint was filed on June 29, 1959, in the name of the Commonwealth of Virginia at the relation of Virginia State Bar, which is an administrative agency of the Commonwealth of Virginia, composed of all lawyers licensed to practice law in the state, and which has the duty to investigate and report violations of statutes and the Canons of Professional Ethics concerning the practice of law within this state. The defendant is an unincorporated trade union operating in all of the states of the union and in the City of Richmond, Virginia. The complainant contends that acts of the respondent are contrary to and violative of the Code of Virginia of 1950, as amended, specifically, §§ 54-42, 54-44, 54-51, 54-52, and 54-83.1 and the Definitions of the Practice of Law by the Supreme Court of Appeals of Virginia (pursuant to § 54-48) 201 Va. lxxxv, the Common Law, and Canons of Ethics of the American Bar Association, adopted in this state. This cause is before this court again pursuant to the order of the Supreme Court of Appeals of Virginia, which remanded it for further action not inconsistent

with the opinion of the Supreme Court of the United States, handed down on April 20, 1964.

The remand to this court is deemed by the Brotherhood to require the review of the evidence, and I have read the testimony and examined numerous exhibits in the four volumes of the printed record which were before the Supreme Court of the United States. The evidence is replete with direct testimony and documents, and the testimony and opinions in other courts on the prosecutions of and injunctions against Brotherhood, and its Counsel, investigators, solicitors for counsel, and consent decrees involving the Brotherhood and its Counsel, reprimands to Counsel, and certain financial records from the national office in Cleveland. There are also agreements by B.R.T. Counsel not to violate the Canons of Legal Ethics. The findings of fact by my able predecessor in this court, Judge Brockenbrough Lamb, speak as of the date of the decree, January 29, 1962, although the hearing was concluded earlier, and include acts both prior and subsequent to April 1, 1959, which is the cleavage date between the "former" and the "reformed" practices of the Brotherhood, as claimed by it.

The Legal Aid Bureau (later Legal Aid Department) was created in 1930 to aid the worker because, in the words of its organizers, "Lawyers were taking advantage of them." Its operation was essentially similar to the allegations in the complaint, except that it then furnished legal advice. The Brotherhood has never considered itself guilty of any wrongdoing from that day to the present. Its chief counsel testified on January 5, 1932, "I don't think a great deal of odium attaches to ambulance chasing. . . I consider it unethical, but I mean from a purely moral standpoint." (*Re Petition of the Committee on Rule 28*, Court of Appeals, Cuyahoya Co., Ohio)

On June 15, 1946, A. F. Whitney, then National President, wrote a letter addressed to "All Regional Counsel" advising them that neither the Brotherhood nor any department or bureau thereof is financially interested in any cases then pending or to be filed by them against common carriers, and that no part of any fee received was antici-

pated or would be received by the Brotherhood. There does not appear to have been any change in the operation of the Legal Aid Department as the result of this directive, as shown by evidence of prior and subsequent acts.

The Brotherhood cannot deny that the evidence shows that the operation of the Legal Aid Department, designated the Department of Legal Counsel after January 1, 1959, was in the manner alleged in the bill of complaint. Its investigators worked on several different bases of compensation: flat fees, salaries, or commissions, or combinations of each. Counsel charged Brotherhood members 25 per cent of recoveries, whether by suit or settlement, while nonmembers paid 33 1/3 per cent. Five per cent of the recovery (in some cases, six) was paid to the Department. The Brotherhood was able to state in its answer, paragraph 6, that only "some" cases reached its Counsel, because the Department was interested only in those having high recovery potentials. At first, payments to the Department were included in the fees, but later the members made direct assignments to the Department. The investigators carried photographs of large settlement checks for exhibition to injured members and forms for the employment of the specified counsel. Their job was to solicit legal business. There were also others, designated "bird dogs," who operated in the same manner and notified the Counsel, or the Department, or the investigator of the occurrence of accidents, with the name and address of the injured worker. While "bird dogging" was the duty of the secretary of the local lodge, other members were also engaged in this profitable enterprise, receiving as much as $1,500.00 in the largest cases. The investigators and the "bird dogs" were authorized to represent to the potential client that he would be reimbursed by the Counsel for travel and hotel expense in visiting the Counsel, and that the latter would advance money for a portion of his living expenses during the pendency of the claim. Counsel would also reimburse the member for his loss of time and travel expense in bringing an injured member to visit Counsel. Counsel paid all court costs, medical fees, court reporters' fees, and costs of appeals from his own pocket. In one year, each of two law firms reported to the Department that its recoveries totalled almost $3,000,000.00. The individual counsel did not consider that they had been

employed, but that "the Department" had been employed. Counsel were, and are, named solely by the National President to serve during his pleasure. The "Legal Aid Department" was not operated as true legal aid within the accepted sense of free aid to indigent persons, nor under § 54.52.1 of the Code of Virginia, 1950.

The Brotherhood's publications containing a list of its sixteen Regional or Legal Counsel were sent to each member. One or more of its Counsel customarily appeared on the programs at national conventions and also at local functions, which investigators also attended.

The Brotherhood contends that it has complied with the restrictions of the Illinois decree (*In re Brotherhood of Railroad Trainmen*, 13 Ill. 2d 391, 150 N.E.2d 163 (1958)) since April 1, 1959. This decree was the result of the Brotherhood's petition for clarification of its procedures. The objectionable practices of the Legal Aid scheme were enjoined by this decree. The Brotherhood was permitted to advise the employment of counsel before settling claims, suggest competent counsel, investigate personal injury accidents at its own expense, and give its members these investigation reports. The Court also said "Such investigations can be financed directly and without undue burden by the 218,000 members of the Brotherhood." The objectionable practices herein described were prohibited.

Counsel for the Brotherhood said, in regard to Paragraph 9-C of its Answer (Printed Record 436):

> The respondent alleges that it has the legal right, it has the constitutional right to advise with its members, give them any information it has, and also to advise lawyers, generally and specifically, but not to channel business. I don't think it has that right. That would be our evidence.

Replying to a question by this court regarding "the setup," counsel for the Brotherhood said (P.R. 447):

> I am not trying even to justify it, because I have said in my Answer, that this is wrong . . . but this is clearly wrong . . . . It was

absolutely unethical, in my opinion, but we say we are no longer doing it since April (1959), since the Illinois court told us we could not do it.

The Brotherhood admitted many of the allegations of the bill in its answer and its statements filed by orders of this court. It has subsequently admitted, in statements by its counsel in this court and before the Supreme Court of the United States, the correctness of these allegations and the findings of fact by this court, but it says that it has not operated in this manner in the State of Virginia since April 1, 1959, and that an injunction should not be entered because the practices have ceased.

The Brotherhood's motion to strike all evidence of the complainant was accompanied by eight written motions to strike the four exhibits filed with the testimony of National President Kennedy and the testimony of ten witnesses.

The first three of the Kennedy exhibits were probably innocuous in the Brotherhood's view as they referred to acts prior to April 1, 1959, namely, the conviction in Montana of an investigator for the unauthorized practice of law, a newspaper advertisement warning the public of this man's activities, and a broadcast letter from "E. A. Stouvenel, BRT Investigator" advising all lodge brothers in his region to report all injuries to him promptly. But the last exhibit was a reprint from the Brotherhood's publication, *Trainmen News*, of April 10, 1961, announcing that a party had been held in Columbus, Ohio, at which a member of a legal counsel firm had delivered a talk on "legal aid," and that he had been accompanied by a named BRT investigator.

The eight injuries described in the testimony of the ten witnesses occurred between June 6, 1959, and June 29, 1960, in seven states (two in Indiana). The solicitation began immediately thereafter. In the Georgia case, there was competing solicitation between BRT Counsel in Atlanta and Birmingham. In two instances, members were solicited in other states on behalf of the Henslee firm, the Regional Counsel located in Illinois. The evidence was that the scheme for solicitation was still in operation.

The grounds of each motion were that the incidents did not occur in Virginia and the evidence did not show violations in Virginia. There was added parenthetically that the Brotherhood did not know what practices might be unauthorized in the foreign states. The Brotherhood at the date of filing this motion, January 23, 1962, was contending that it had been complying with the Illinois decree on a nationwide basis since April 1, 1959, for approximately thirty-four months. However, the record shows that its practices had been condemned previously in at least four of these seven states, namely, Ohio, Iowa, California, and Pennsylvania. In this connection, it may also be noted that between April 1, 1959, and the final decree of this court, consent decrees were entered in Oklahoma, Missouri, and Nebraska against Counsel and/or Investigators. The scheme of the Brotherhood was fully continued on the local level after April 1, 1959, and up to the closing of the Bar evidence in the fall of 1961, as if the Illinois decree had never been entered.

Notice of the appointment of Counsel continued to be carried in *The Railroad Trainmen* after April 1, 1959. Payments by Counsel to the Brotherhood continued at least through April, 1960, according to its records. The same source shows that there was paid to the Brotherhood in 1959 the sum of $158,080.06, an increase of some $1,200.00 over 1958. The first three months of 1960 show receipts of $23,410.31. Counsel were charging the previous fee of 25 per cent, but, in some instances, expenses were charged to the client. The National President continues to have the sole power of appointment and removal of Counsel.

The evidence as to the intentions of the Brotherhood is plain and beyond controversy. It continued its objectionable practices both after President Whitney's directive of 1946 and after President Kennedy's order effective on April 1, 1959. The intention of its chief counsel, McGrath as expressed by him in 1932, prevailed on January 29, 1962, and there is reasonable ground to apprehend that the entire "plan" is now, or will be, adopted and put into effect within the jurisdiction of this court.

The scheme which was adopted to protect the railroad trainmen from "incompetent and unscrupulous" attorneys provided handsome incomes to sixteen Regional Counsel

who were answerable to one man only. The Legal Department was maintained by the injuries or deaths of these workers.

The Brotherhood contends that the injunction should not have been issued because it had ceased the practices described in the bill of complaint. This is similar to a plea of confession and avoidance. But such a plan will not be availing to prevent the issuance of an injunction. The evidence plainly proves that the practices begun in 1930 continued to a date only a few short months prior to the entry of the restraining order of this court (with the possible exception of furnishing free legal advice). Pursuant to a rising clamor of bar associations across the country, the Brotherhood pretended to abolish its unauthorized practice of law and unlawful practices in connection therewith in 1946 and again in 1959. It did not do so. On January 29, 1961, this court had not merely reasonable grounds to believe that these activities would be resumed, it had evidence to prove that such activities had been resumed.

A repetition of the following hornbook principles may not be inappropriate. Injunctions may be granted where the injury is impending and threatened, or continually repeated and threatened, or probable and threatened, or certainly impending, or reasonably apprehended. It is not necessary to await the occurrence of the injury. Cessation of the wrongful acts, before or after suit, will not bar injunctive relief. An anticipated injury is irreparable when fair and reasonable redress is unobtainable in a court of law. *Pennsylvania v. West Virginia*, 262 U.S. 553, 593, 43 S. Ct. 658, 663, 67 L. Ed. 1144 (1923); *Carter v. Carter Coal Co.*, 298 U.S. 238, 56 S. Ct. 855, 80 L. Ed. 1160 (1936); *Brown v. Hecht Co.*, 321 U.S. 321, 327, 64 S. Ct. 587, 591 (1944); *Turner v. Hicks*, 164 Va. 612, 617, 180 S.E. 543 (1935); *Tate v. Ogg*, 170 Va. 95, 195 S.E. 496 (1938); 43 Corpus Juris Secundum 436, 445, 447, *Injunctions*, §§ 21, 22, 23; 28 American Jurisprudence 495, 522, 543, *Injunctions*, §§ 7, 30, 48.

With the foregoing background, this court entered its decree of January 29, 1962, which was vacated by the Supreme Court of the United States on the petition of the Brotherhood. The first question presented for review by the petition was:

Whether the Brotherhood of Railroad Trainmen and its members have the right to make known to its members generally, and to injured members and their survivors in particular, first, the advisability of obtaining legal advice before making settlement of their claims, and second, the names of attorneys, who, in its and their opinion, have the capacity to handle such claims successfully, and whether this right is protected by the First and Fourteenth Amendments to the Constitution of the United States?"

The first error to be specified was the refusal of the Supreme Court of Appeals of Virginia to grant an appeal to the Brotherhood and to hold that the Brotherhood and its members have the protected rights stated in the first question above.

The second question to be presented, and the second error, pertained to the Federal Railway Labor Act, 45 U.S.C.A. §§ 151-188. The Supreme Court did not consider this in its opinion.

The Supreme Court was of the opinion that this court's decree violated the rights of the Brotherhood and its members are stated in the first question.

The petition was seemingly innocent in its statement of the question presented for review and the error of the court below. The language of the decree alleged to violate the right of free speech was never specifically identified in the petition. It was apparent that the Brotherhood was interested in more than freedom of speech.

In view of the alleged uncertainty or misconception of the opinion by Mr. Justice Black and the remand for further proceedings, it is necessary to study his opinion minutely in order to enter an appropriate decree on the evidence, and not inconsistent with that opinion. 377 U.S. 1, 84 S. Ct. 1113, 12 L. Ed 2d 89.

Mr. Justice Black stated (84 S. Ct. 1114) that "we granted certiorari to consider this constitutional question in the light of our recent decision in *N.A.A.C.P. v. Button*, 371 U.S. 415, 372 U.S. 905." He referred to the freedom of speech, petition, and assembly. But in *Button*, the activity of *N.A.A.C.P.* was political, its aim was to eliminate racial discrimination and obtain the constitu-

tionally guaranteed civil rights of Negroes. The association paid its regular attorneys, it did not profit financially from the attorney and client relationship, although it controlled the litigation; sometimes the client was not a member of the association; and members were not paid to induce contracts of employment. The organizations' lawsuits were for racial, not individual, benefit.

In view of the fact that the controversy in this suit relates to the personal injury claims of trainmen against railroads, the following passage from *Button* (p. 429) should be recalled:

> In the context of N.A.A.C.P. objectives, litigation is not a technique of resolving private differences; it is a means for achieving the lawful objectives of equality of treatment by all government, federal, state and local, for the members of the Negro community in this country. It is thus a form of *political expression.* (Emphasis supplied).

Mr. Justice Black distinguishes (p. 1116) between the advice, on the one hand, to injured members to obtain legal services and to recommend particular attorneys and, on the other hand, the resulting channelling of legal employment. He then states that the injunction against "this particular practice" denies the members their constitutional rights. Obviously, "practice" does not refer to the result, because a result is not a practice and a practice is a repeated act or a series of acts. If Mr. Justice Black had wished to state that the injunction against the channelling of legal employment deprived the members of constitutional rights, he could have substituted "plan" for "practice." As he did not, his intention is plain -- he referred to and approved only advice and recommendation. It is also noted that the denial of rights was to the members, not to the Brotherhood. The members had the constitutional rights.

Mr. Justice Black quoted (p. 1117) from *Button*: "a State cannot foreclose the exercise of constitutional rights by mere labels." He then employs the labels "commercialization of the legal profession" and "ambulance chasing" and states that Virginia has not sought to halt these

practices. Mr. Justice Black understood, from the briefs and oral arguments, and his quotation beginning at the bottom of page 1115, Virginia's position that it was attempting to stop the commercialization of the legal profession and "ambulance chasing" by the Brotherhood. He must therefore have referred to the petition for the writ which was not on the ground that the injunction prohibited unauthorized practice of law and violation of legal ethics, but on the ground that freedom of speech had been forbidden in the enjoining of advice by workers to each other to employ lawyers and their recommendation of competent lawyers, because in the next sentence he says that such recommendation is not the practice of law and that such recommended lawyers are not guilty of solicitation. He refers again at the close of his opinion to advice to employ attorneys, to recommendation of attorneys, and to the freedom from taint of such attorneys.

The opinion does *not* approve of unauthorized law practice. It has done no more than state that union members may advise one another to employ competent lawyers in personal injury or death cases and to recommend competent lawyers, and that lawyers so recommended are not guilty of the solicitation of law practice, and that these acts may not be prevented by a State. It further declares that Virginia has failed to show any appreciable public interest in preventing the Brotherhood from executing its plan to recommend lawyers of its selection. With all due deference, it must be stated that Virginia does not attempt in this suit to prevent "recommendation" and that the injunction of this court did not apply to "recommendation," but to unethical solicitation and the unauthorized practice of law.

The conclusion of the opinion can give the Brotherhood no comfort (p. 1118): "We hold that the First and Fourteenth Amendments protect the right of the members through their Brotherhood to maintain and carry out their plan for advising workers who are injured to obtain legal advice and for recommending lawyers." This was precisely what the Brotherhood stated in the first question presented for review (Petition for Writ, p. 6) and the "particular practice" which the court approved at page 1116. In the eyes of the Brotherhood, the "plan" meant their whole scheme of operation - unauthorized practice, lay intermedia-

ry, fee splitting, et cetera. However, Mr. Justice Black approved only of the plan for advising injured workers to employ lawyers and the recommendation of specific lawyers (cf. first paragraph of page 1116). He then declares "Since the part of the decree to which the Brotherhood objects infringes those rights, it cannot stand; and to the extent any other part of the decree forbids these activities it too must fall." The part of the decree to which the Brotherhood objects is referred to in its petition for the writ, but its specific language is nowhere mentioned or pointed out. The Brotherhood really objects to the entire decree. The intent is plain: Any part of the decree of this court which forbade the members, through the Brotherhood, from advising injured members to obtain legal services and from recommending specific lawyers violates their constitutional rights under the First and Fourteenth Amendments and is null and void, and the decree should be accordingly modified and amended; and any lawyers accepting employment pursuant to such recommendations are similarly protected by these amendments.

I have studied the dissenting opinion by Mr. Justice Clark, concurred in by Mr. Justice Harlan (Mr. Justice Stewart not participating in the decision), and the petitions for a rehearing (denied) by Virginia State Bar, American Bar Association and forty-six state bar associations. While the language regarding the commercialization of the legal profession and "ambulance chasing" may be difficult to reconcile with the holding by the Court, it is the *actual* holding of the Court on the narrow issue raised by the petition which is determinative of the true meaning of the majority opinion. The petitions for the rehearing sought clarification of the language of the opinion. Evidently, the majority of the Court, zealous as they are of the maintenance of high standards by the bar, were of the opinion that their decision does not approve of the commercialization of the legal profession and "ambulance chasing" or any of the objectionable practices of the Brotherhood in evidence in this case. It may be noted that the headnote writer for West Publishing Company, 83 S. Ct. 328, did not perceive the dire interpretation of others. The principal headnote reads "held that injunction restraining Brotherhood from maintaining and carrying out plan for advising injured workers to obtain

legal advice and for recommending specific attorneys denied members rights guaranteed by First and Fourteenth Amendments." None of the thirteen classified headnotes (seven on Constitutional Law, four on Attorney and Client, one on Courts, and one on Labor Relations) indicate approval by the Court of unauthorized practices of law or violation of legal ethics.

### Final Order

This cause, which was by final order entered on January 29, 1962, stricken from the docket with leave for reinstatement for good cause shown came on this day to be again heard upon the papers formerly read and evidence formerly adduced; upon the Notice of Appeal and Assignments of Error of the defendant, filed herein on March 7, 1962; upon the Notice of Appeal and Additional Assignments of Error to said final decree filed herein by the defendant on March 29, 1962; upon the order of the Supreme Court of Appeals of Virginia entered June 12, 1962, refusing an appeal from said final decree of this court entered January 29, 1962; on the order of the said Court entered August 31, 1962, denying the petition of said defendant for rehearing; upon the petition of said defendant to the Supreme Court of the United States filed therein on November 8, 1962, for Writ of Certiorari to the Supreme Court of Appeals of Virginia; upon the transcript by Gilbert Halasz, Stenotype Reporter, of the oral arguments by counsel before the Supreme Court of the United States on January 11, 1964, filed on July 21, 1964, and made a part of the record in this cause; on the opinion of the latter court by Mr. Justice Black and the dissenting opinion by Mr. Justice Clark, both rendered April 20, 1964; upon the Petition for Rehearing of the complainant filed in the latter court on May 15, 1964; upon its order entered June 2, 1964, denying said petition and vacating the order of the Supreme Court of Appeals of Virginia entered August 31, 1962, and directing that the cause be remanded to said Court for further proceedings, not inconsistent with the said opinion; upon the order of the Supreme Court of Appeals of Virginia entered June 17, 1964, reversing the said order of this Court, and remanding this cause to this Court for further proceedings,

not inconsistent with the views expressed in the said written opinion; on the motion of the complainant on July 21, 1964, for the entry of a final decree upon the record herein enjoining the defendant, Brotherhood of Railroad Trainmen, its officers, agents, servants and employees from engaging in each, every and all of the practices shown by the record herein to have been engaged in by said defendant that have not been held by the Supreme Court of the United States by its opinion rendered April 20, 1964, to be protected by the First and Fourteenth Amendments to the Constitution of the United States as set forth in said opinion and not inconsistent therewith, which said motion was accompanied by the tender of the four printed volumes of the transcript of record in this cause in the Supreme Court of the United States, October term, 1963, No. 34, said four volumes of the transcript of record being for convenience filed herein, all being made a part of the record in this cause; and was argued by counsel.

Upon consideration whereof, it appearing that, in accordance with the directions of the Supreme Court of the United States and of the Supreme Court of Appeals of Virginia, this Court is required to revise and amend the injunction heretofore awarded by its decree of January 29, 1962, upon the facts therein found and the evidence before the Court so that the same shall not be inconsistent with the opinion of the Supreme Court of the United States and will not infringe upon those rights of the defendant and its members which are protected by the First and Fourteenth Amendments to the Constitution of the United States, to-wit: to advise injured members and the families of deceased members that they should obtain legal advice before settling claims for personal injury or death and to recommend a specific lawyer or lawyers to handle such claims, the Court adopts and reaffirms in all respects the findings of fact heretofore recited in the decree of this Court entered on January 29, 1962.

Wherefore, the court doth adjudge, order and decree that the Brotherhood of Railroad Trainmen, its officers, agents, servants, employees, members and anyone acting in its behalf, be, and they now are, permanently restrained and enjoined from giving or furnishing legal advice to its members or their families; from soliciting for, or

on behalf of, its Regional or Legal Counsel or any other lawyer, any of its members, their families or any other person to employ such Regional or Legal Counsel or other lawyer to represent him, her or them in court or otherwise, in respect to any claim for personal injury, death or in relation to property; from informing any lawyer or lawyers or any person whomsoever that an accident has been suffered by a member or non-member of the said Brotherhood and furnishing the name and address of such injured or deceased person for the purpose of obtaining legal employment for any lawyer; from stating or suggesting that a recommended lawyer will defray expenses of any kind or make advances for any purpose to such injured persons or their families pending settlement of their claims; from controlling, directly or indirectly, the fees charged or to be charged by any lawyer; from accepting or receiving compensation of any kind, directly or indirectly for the solicitation of legal employment for any lawyer, whether by way of salary, commission or otherwise; from sharing in any manner in the legal fees of any lawyer or countenancing the splitting of or sharing in such fees with any layman or lay agency; from sharing in any recovery for personal injury or death by gift, assignment or otherwise; from doing any act or combination of acts that constitutes or amounts to the solicitation of legal employment for or on behalf of any lawyer, or conspiring to do so; and, in general, from violating the laws governing the practice of law in the Commonwealth of Virginia and from aiding and abetting others to do so.

But nothing herein contained shall be construed to infringe upon or restrict the constitutional rights of the defendant, its officers, agents, servants, employees or members, to advise the defendant's members or their families or others, to obtain legal advice before making settlement of their claims for injury or death, and to recommend a specific lawyer or lawyers to give such advice or handle such claims; provided, however, that the circumstances of such advice and recommendation shall not constitute or amount to, the solicitation of legal employment for or on behalf of any lawyer or lawyers. The term "solicit" and its derivatives, as herein employed, shall refer to the same terms as employed or intended by the common law, the statutes of this state, and Canons of Legal

Ethics of the American Bar Association, adopted in this state.

The Brotherhood of Railroad Trainmen will be put upon notice of this decree by the delivery of a copy hereof to its counsel of record and it is further ordered that an attested copy of this decree be served on the Secretary of each subordinate lodge of the defendant, Brotherhood of Railroad Trainmen, in the Commonwealth of Virginia from a list thereof to be supplied by counsel for defendant.

To all of the provisions of this decree the defendant objected and excepted.

The objects for which this suit was instituted and remanded having been fully accomplished, and the directions of the Supreme Court of the United States and of the Supreme Court of Appeals of Virginia having been fully complied with, it is ordered that the cause be stricken from the docket and the papers placed among the ended causes, properly indexed, with leave reserved to any party to have the suit reinstated for good cause shown and after such notice as the Court may require.