(No. 39642.—

ILLINOIS STATE BAR ASSOCIATION *et al.,* Appellees, *vs.* UNITED MINE WORKERS OF AMERICA; DISTRICT 12, Appellant.

*Opinion filed May 23, 1966.—Rehearing denied September 21, 1966.*

EDMUND BURKE, of Springfield, (GILLESPIE, BURKE & GILLESPIE, of counsel,) for appellant.

BERNARD H. BERTRAND, of East St. Louis, and DAVID J. A. HAYES, JR., of Springfield, for appellees.

PER CURIAM: The Illinois State Bar Association and others, individually and as members of the Committee on Unauthorized Practice of Law, filed a complaint in the circuit court of Sangamon County seeking to restrain defendant, United Mine Workers of America, District 12, from engaging in activities alleged to constitute the unauthorized practice of law. The trial court entered a summary decree granting the relief requested. From that determination the Mine Workers appeal, contending that the decree violates the first and fourteenth amendments to the United States constitution.

The facts are substantially undisputed. For many years, the Mine Workers, a voluntary association, has employed a licensed attorney on a salary basis to represent members and their dependents in connection with claims for personal injury and death under the Workmen's Compensation Act. It is understood and provided that members may employ other counsel if they so desire. Selection of the attorney was made by the Executive Board of District 12, and the terms of his employment agreed upon by the acting president and the attorney pursuant to board authorization. The letter from the former to the latter outlining the terms of employment contains the following sentence: "You will receive no further instructions or directions and have no interference from the District, nor from any officer, and your obligations and relations will be to and with only the several persons you represent."

The plan, as described by the current salaried attorney, operates as follows: Injured members are furnished forms by the union entitled "Report to Attorney on Accidents" which advise such injured members to fill out and send the forms to the Legal Department, District 12, United Mine Workers of America. When one of such forms is received by the legal department the salaried attorney presumes that it constitutes a request that he file with the Industrial Com-

mission an application for adjustment of claim on behalf of the injured union member although there is no language appearing on the form which specifically requests that the salaried attorney file such claim. The application for adjustment of claim is prepared by secretaries in the union offices and when completed is sent by the secretaries directly to the Industrial Commission. In most instances the salaried attorney has not seen or conferred with the injured member at the time the claim is filed with the commission, although it is understood by the union membership that the attorney is available for conferences on certain days at particular locations. Between the time the claim is filed and the hearing before the commission, the salaried attorney prepares his case from his file and from examination of the application, usually without having a conference with the union member with regard to the latter's claim. Ordinarily, the only thing an injured member receives concerning his claim is a notice to appear before the Industrial Commission, and usually this is the first time the attorney and the injured member come into contact with each other.

The attorney determines what he believes the claim is worth, presents his views to the attorney for the respondent coal company during prehearing negotiation, and attempts to reach a settlement. If the coal company agrees with the Mine Workers' attorney, the latter recommends to the injured member that he accept such resolution of his claim. If a settlement is not reached, a hearing on the merits of the claim is held before the Industrial Commission.

The full amount of the settlement or award is paid directly to the injured member. No deductions are taken therefrom, and the attorney receives no part thereof, his entire compensation being his annual salary paid by the union.

The question for decision is whether the above related activities amount to the unauthorized practice of law by the Mine Workers under prior determinations of this court,

and, if so, whether such activity is nevertheless protected by the first and fourteenth amendments to the United States constitution.

It may be noted here that the services rendered the union members in the handling of their compensation claims were legal services and that one who performs them is engaged in the practice of law. *People ex rel. Chicago Bar Association v. Goodman,* 366 Ill. 346.

It is argued by the Illinois State Federation of Labor and Congress of Industrial Organizations, AFL-CIO, as *amicus curiae,* that since the United Mine Workers, District 12, is a voluntary, unincorporated association and not a legal entity separate and apart from its constituency, there is no problem concerning the existence of a lay intermediary between the individual member and the attorney. Under this view, the attorney is merely employed collectively by the members of the association to present claims before the Industrial Commission. While it is correct that it has been held that a voluntary association such as the Mine Workers is not a legal entity amenable to process and suit at law (*Cahill v. Plumbers, Gas and Steam Fitters' and Helpers' Local 93,* 238 Ill. App. 123, 127; *Chicago Grain Trimmers Association v. Murphy,* 389 Ill. 102, 109; 4 Am. Jur., Associations & Clubs, par. 41), this is not to say that such voluntary, unincorporated associations may not sufficiently partake .of the nature of separate entities so as to pose serious problems regarding substantial interference with the attorney-client relationship. (As to whether unincorporated labor unions should be treated as "entities", see The Legal Status and Suability of Labor Organizations, 28 Temple Law Quarterly 1.) In any event we are concerned here not with legal forms, but activities of the association. It is the latter which must determine whether the association is engaging in the unauthorized practice of law. See *Rhode Island Bar Association v. Automobile Service Association,* 55 R.I. 122, 179 Atl. 139.

It is clear that under the prior decisions of this court, organizations, including not-for-profit organizations, which hire or retain lawyers to represent their individual members in legal matters are ordinarily engaging in the unauthorized practice of law. (*People ex rel. Courtney* v. *Association of Real Estate Tax-payers of Illinois,* 354 Ill. 102; *People ex rel. Chicago Bar Association* v. *The Motorists Association of Illinois,* 354 Ill. 595; *People ex rel. Chicago Bar Association* v. *Chicago Motor Club,* 362 Ill. 50.) The underlying reasons for such conclusion are that the "relation of trust and confidence essential to the relation of attorney and client did not exist between the members of the respondent association and its attorneys, and whatever relation of trust and confidence existed was between the membership and the association." (*People ex rel. Courtney* v. *Association of Real Estate Tax-payers,* p. 109.) And, as was said in *Chicago Motor Club,* p. 57: "Legal services cannot be capitalized for the profit of laymen, corporate or otherwise, directly or indirectly, in this State. In practically every jurisdiction where the issue has been raised it has been held that the public welfare demands that legal services should not be commercialized, and that no corporation, association or partnership of laymen can contract with its members to supply them with legal services, as if that service were a commodity which could be advertised, bought, sold and delivered."

See, also, *People ex rel. Chicago Bar Association* v. *Goodman,* 366 Ill. 346, a case involving a lay respondent's employment of lawyers to represent injured persons whose workmen's compensation claims respondent was attempting to settle, where the court said at page 356: "The faithful observance of the fiduciary and confidential relationship between attorney and client is one of the greatest traditions of the legal profession. In Goodman's business that relationship is absent as to the litigant whom the attorney employed by Goodman purportedly represents. The respondent is the

attorney's real client and paymaster, and the one to whom the attorney owes allegiance."

Thought to be of paramount importance to the public is the preservation of the integrity of the lawyer-client relationship involving the highest degree of trust and confidence, and an unswerving dedication of the lawyer's abilities to the interests of his client. Intervention in this relationship of third-party organizations by whom lawyers are directly employed and compensated to handle personal claims of organization members has generally been prohibited. See cases in 7 Am. Jur. 2d, p. 100; 157 A.L.R. 292.

In *In Re Brotherhood of Railroad Trainmen,* 13 Ill.2d 391, this court applied the foregoing considerations to an organization similar in structure to the United Mine Workers association. There, the brotherhood, through its Legal Aid Department, had established a nationwide scheme whereby "regional counsel" were selected by the Brotherhood. These attorneys paid the departmental operating costs and were, in turn, recommended to individual brotherhood members as competent to represent them on personal injury and death claims. In that case this court held impermissible any "financial connection of any kind between the Brotherhood and any lawyer" in connection with personal injury claims of brotherhood members. However, the court specifically set forth an alternate plan which would be permissible. Reference thereto is appropriate here. It was there stated: "The Brotherhood has a legitimate interest in investigating the circumstances under which one of its members has been injured. That interest antedates the occurrence of any particular injury. We are of the opinion that the Brotherhood may properly maintain a staff to investigate injuries to its members. It may so conduct those investigations that their results are of maximum value to its members in prosecuting their individual claims, and it may make the reports of those investigations available to the injured man or his survivors. Such investigations can be fi-

nanced directly and without undue burden by the 218,000 members of the Brotherhood. The Brotherhood may also make known to its members generally, and to injured members and their survivors in particular, first, the advisability of obtaining legal advice before making a settlement and second, the names of attorneys who, in its opinion, have the capacity to handle such claims successfully." (13 Ill.2d at pages 397-98.) We also specifically refuted the argument, presented again here, that the collective interest of the members of the union in recovering adequate compensation for bodily injury and death is largely synonymous with the individual members' interests concerning their particular claims, holding that, "While these considerations have weight, they are insufficient in our opinion to override the principles that must govern the members of the legal profession in their relations with clients."

Also relevant to our inquiry here are the Canons of Ethics of the Illinois State Bar Association and the Chicago Bar Association. While such canons do not have the force and effect of judicial decision or statutory law, they nevertheless are of interest to this court, provide guidelines to members of the profession and are helpful in reaching determinations in particular cases. Canons 35 and 47 provide:

"(35) Intermediaries. The professional services of a lawyer should not be controlled or exploited by any lay agency, personal or corporate, which intervenes between client and lawyer. A lawyer's responsibilities and qualifications are individual. He should avoid all relations which direct the performance of his duties by or in the interest of such intermediary. A lawyer's relation to his client should be personal, and the responsibility should be direct to the client. Charitable societies rendering aid to the indigent are not deemed such intermediaries.

"A lawyer may accept employment from any organization, such as an association, club or trade organization,

to render legal services in any matter in which the organization, as an entity, is interested, but this employment should not include the rendering of legal services to the members of such an organization in respect to their individual affairs. * * *

"(47) Aiding the Unauthorized Practice of Law. No lawyer shall permit his professional services, or his name, to be used in aid of, or to make possible, the unauthorized practice of law by any lay agency, personal or corporate."

These canons are similar to those of the American Bar Association which have been interpreted by that group as precluding the employment arrangement now before us. (Informative Opinion A of 1950 of the American Bar Association Standing Committee on Unauthorized Practice of Law.)

In our consideration of this case, the policy arguments of the Mine Workers and *amici* are impressive. There can be no question of the hazards involved in coal mining, and undoubtedly the possibility exists that injured coal miners untutored in the intricacies of workmen's compensation law might accept wholly inadequate settlements. Benefit to the miner, in that compensation of counsel under the plan here in effect is from the union treasury rather than the injured member or his family, is not to be easily disregarded, nor is it to be denied that the organization has an active interest in securing fair treatment for its members. Arrangements whereby common interest groups provide legal services for their membership have respected advocates and are recognized as proper in varying forms by some States. (See Markus, Group Representation by Attorneys as Misconduct, 14 Cleveland-Marshall Law Review, 1, (1965).) But, persuasive as these and other considerations are, we believe as in *In Re Brotherhood of Railroad Trainmen* that they are insufficient to override the governing principles in the attorney-client relationship.

That relationship is pre-eminently personal in nature

and the fundamental duty of an attorney involves undiluted loyalty to the client whom he serves and whose interests he protects, considerations we believe largely absent where the attorney has been selected and hired on a salary basis by a lay intermediary to represent individual clients. It is basically a master-servant relationship, but as the New York Court of Appeals has put it (*In Re Cooperative Law Co.* 198 N.Y. 479, 483-4, 92 N.E. 15-16), it is such "in a limited and dignified sense, and it involves the highest trust and confidence." In the case before us, the lawyer is not directly employed by the miner for whose peculiarly personal and individual injury he seeks compensation; he is chosen and employed by the officers of the union. The lawyer is not paid for his services by the client; his salary is paid by the association. Even though the terms of the letter of employment indicate no organizational direction will be given, the interests of the employer and the client in a given case may or may not be identical, since as the AFL-CIO *amicus* brief indicates, the interests of the union, collectively, may extend beyond the interest of the injured member. Conceivably, the interest of the former might be best served by utilizing a particular case as a testing vehicle for appellate review of untried legal theories in the hope of securing a determination beneficial to union members collectively in future litigation, whereas the injured member may prefer a proffered settlement deemed wholly adequate by him. It is manifest, we believe, that these factors all serve to dilute the allegiance of the lawyer to the client, weaken the integrity of their relationship, and serve the best interests of neither the public nor the parties. We, of course, do not deal here with the totally different case of a salaried lawyer for indigent clients.

We therefore conclude that the United Mine Workers, District 12, are engaging, under our decisions, in the unauthorized practice of law in employing an attorney on a salary basis to represent individual members' claims before

the Industrial Commission. However, our inquiry does not terminate here, for it is argued that Federal statutory law and decisions of the United States Supreme Court preclude restraining the conduct engaged in by the union.

It is maintained by the Mine Workers that the circuit court decree violates their right to engage in concerted activities for the purpose of their mutual aid and protection under section 157 of the Labor Management Relations Act. (29 U.S.C.A. 157.) However, if the conduct attacked was properly determined to constitute thet unauthorized practice of law and is not protected from proscription by constitutional mandate, it cannot seriously be argued that general statutory language granting the right to union members "to engage in * * * concerted activities for the purpose of collective bargaining or other mutual aid or protection" restricts the States from regulating the practice of law. (*In Re Brotherhood of Railroad Trainmen,* 13 Ill.2d 391, 395.) Accordingly, the ultimate inquiry herein is whether the decree of the circuit court violates the guarantees of the first and fourteenth amendments to the United States constitution as interpreted by the United States Supreme Court in the cases of *Brotherhood of Railroad Trainmen* v. *Virginia ex rel. Virginia State Bar,* 377 U.S. 1, 12 L. Ed. 2d 89, and *N.A.A.C.P.* v. *Button,* 371 U.S. 415, 9 L. Ed. 2d 405.

In *Virginia Railroad Trainmen* the court held that "the First and Fourteenth Amendments protect the right of the members through their Brotherhood to maintain and carry out their plan for advising workers who are injured to obtain legal advice and for recommending specific lawyers. Since the part of the decree to which the Brotherhood objects infringes those rights, it cannot stand; and to the extent any other part of the decree forbids these activities it too must fall." 377 U.S. at p. 8.

The court there (377 U.S. 5, n.9) specifically pointed out that the railroad trainmen were objecting to only those

portions of the decree encompassed by the language of the holding, as the brotherhood had denied that it was engaging in practices forbidden by our decree in *In Re Brotherhood of Railroad Trainmen,* 13 Ill.2d 391. Accordingly, that holding does not purport to overturn our decision precluding any financial connection between the brotherhood and the counsel selected by it to handle individual membership claims. As a consequence, we do not read *Virginia Railroad Trainmen* as constitutionally protecting the conduct we are concerned with here, *i.e.* employment on a salary basis by a labor union of counsel to represent individual members' claims before the Industrial Commission. The circuit court decree in question here does not attempt to restrain the union from advising its members to seek legal advice or from recommending particular attorneys thought competent to handle workmen's compensation claims. As related earlier, our decision in *In Re Brotherhood of Railroad Trainmen* specifically allows such conduct.

In *N.A.A.C.P.* v. *Button,* the Supreme Court of the United States held that a system devised by the N.A.A.C.P. to furnish and recommend attorneys (who were apparently compensated on a *per diem* basis by the organization in connection with each case handled) to member litigants for the prosecution of civil rights cases was constitutionally protected by the first and fourteenth amendments. However, the litigation therein engaged was regarded as a form of constitutionally protected political expression and cannot as such be equated with the bodily injury litigation with which we are concerned here. Also, it is to be noted that an apparent dearth of Virginia lawyers willing to handle civil rights litigation was deemed of some importance by the Supreme Court, and at least Mr. Justice Douglas was influenced by his conclusion that the State's attempt to characterize the N.A.A.C.P.'s activities as "solicitation" indicated a legislative purpose to penalize that group because of desegregation activities. Further, the majority opinion

there read the decree of the Virginia Supreme Court of Appeals "as proscribing any arrangement by which prospective litigants are advised to seek the assistance of particular attorneys." (371 U.S. at page 433.) Under such construction, the decree was deemed violative of the first and fourteenth amendment freedoms of speech and expression.

Such is not the case here, as indicated earlier. We held in the *Illinois Brotherhood* case, and the bar associations now concede, that the Mine Workers may validly advise their members to seek legal advice in connection with these claims and may properly recommend particular attorneys deemed competent to handle such litigation.

Each of the opinions in these cases (*Virginia Railroad Trainmen* and *Button*) recognizes the right of individual States to regulate the practice of law and those who practice it insofar as such regulations do not infringe upon first amendment guarantees relating to freedom of association and expression. If infringement results, it is sustainable upon a showing of a compelling State interest. It seems to us that the compelling quality of the State interest, sufficient to justify State regulation here, may well be something less than the quality required to restrict constitutional litigation of the magnitude embraced in *Button*. We seriously doubt that proscription of this salary arrangement constitutes infringement of constitutionally protected rights of the union members. If it be thought to do so, however, we believe it permissible in view of the interest of the State in controlling standards of professional conduct. The prohibition of payment by the organization of the compensation of the lawyer who represents the individual union member seeking redress for his injuries certainly may not be said to be direct suppression of the member's first amendment right to petition the courts. Nor do we think that his right so to do is impaired in a constitutionally objectionable sense unless it can be said that reduction in the net dollar amount remaining to him from the injury award after payment by the member

of his attorney fees is a constitutionally impermissible impairment. Such it might be were we dealing with indigent claimants, but we are not, and the net effect upon the union member differs not at all from that upon other injured citizens.

Should the conduct manifested here be allowed, substantial commercialization of the law profession may follow. Arguably, if a labor union may hire salaried attorneys to represent its individual constituents in occupationally-caused injury litigation, it may expand such activity to encompass legal problems involving domestic relations, contracts, criminal law and other areas of the legal field, for the union collectively is interested in the total welfare of its individual members. It would seem possible, and even likely, that any group of individuals with a similarity of interests would be allowed to associate for the purpose of hiring salaried attorneys to represent its individual members, and that the integrity and personal nature of the attorney-client relationship would thus be substantially impaired, a result we believe contrary to the interest of the public.

The decree of the circuit court of Sangamon County is affirmed.

*Decree affirmed.*